[No. B079011. Second Dist., Div. Four. May 2, 1994.]

SHADOW TRAFFIC NETWORK et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
METRO TRAFFIC CONTROL, INC., Real Party in Interest.

## COUNSEL

Latham & Watkins, Alan I. Rothenberg, William C. Bottger, Jr., and Diane L. Turner for Petitioners.

No appearance for Respondent.

Andrews & Kurth, James B. Hicks and Kathy A. Jorrie for Real Party in Interest.

## OPINION

## VOGEL (C. S.), J.—

### INTRODUCTION

Metro Traffic Control, Inc. (Metro), and Shadow Traffic Network (Shadow) are competitors in the traffic reporting business. Each contracts with radio stations to gather and broadcast information about traffic conditions. In December 1991, Metro sued Shadow, alleging that Shadow was engaging in various business torts.[1]

Each was represented by counsel—Metro by Andrews & Kurth and Shadow by Latham & Watkins. However, in September 1993, the trial court granted Metro's motion to disqualify Latham & Watkins from further representation of Shadow because Latham & Watkins had retained as an expert witness an individual previously interviewed by Andrews & Kurth and to whom confidential information about Metro's lawsuit had been disclosed. This petition by Shadow contests the recusal order. Based upon the record and relevant precedent, we find that the conduct of Latham & Watkins compels disqualification in this case. We therefore uphold the trial court's order and deny the petition.

### FACTUAL AND PROCEDURAL BACKGROUND

*Metro's Meeting With Deloitte & Touche*

On July 19, 1993,[2] two attorneys from Andrews & Kurth, Kathy Jorrie and Valerie Langs, met with four representatives from Deloitte & Touche, a "Big-Six" accounting firm, to discuss the possible retention of individuals from that firm as expert witnesses to testify in the upcoming trial. The four Deloitte & Touche personnel were: Julie Dodds, David Thompson, Steven Wagner, and Catherine Watson. During the meeting, which lasted approximately one hour, aspects of Metro's action against Shadow were discussed.

---

[1] In *Metro Traffic Control, Inc.* v. *Shadow Traffic Network* (1994) 22 Cal.App.4th 853 [27 Cal.Rptr.2d 573], we affirmed the trial court's decision to deny Metro's request for a preliminary injunction to restrain Shadow from soliciting Metro's employees.

[2] All subsequent dates refer to events taking place in 1993.

At the meeting, Deloitte & Touche did not receive an engagement letter, retainer, or any compensation.

On July 20 or 21, Andrews & Kurth informed Dodds of Metro's decision not to retain any representatives from Deloitte & Touche as expert witnesses. The reason given for the decision was cost. (Andrews & Kurth subsequently retained Ernst & Young as its expert.)

*Shadow's Communications With Deloitte & Touche*

On August 6, two attorneys from Latham & Watkins, William Bottger and Joseph Farrell, met with Dodds and Watson to discuss the hiring of an expert to testify on Shadow's behalf in the action brought against it by Metro. Dodds informed them that Andrews & Kurth had interviewed her firm for the same purpose but had decided not to retain it. Dodds suggested two individuals to Bottger, Thompson and Wagner. Bottger expressed interest only in Thompson because of his background in broadcasting. As Thompson was then on vacation, Dodds gave Bottger his telephone number.

On August 9, Bottger spoke by phone with Thompson who informed Bottger that he (Thompson) had discussed the case with Metro's counsel. After discussing the nature of Thompson's anticipated testimony, Bottger agreed to hire Thompson. That same day (August 9), Shadow filed a supplemental expert witness list designating Thompson as an expert witness and stating that Thompson had "agreed to testify at trial and is expected to testify regarding the calculation and amount of damages claimed by Plaintiff Metro . . . ." At no point did Bottger contact Andrews & Kurth about its prior meeting and discussion with Deloitte & Touche representatives.

*Metro's Motion to Disqualify Latham & Watkins*

On August 11, Andrews & Kurth first learned of Shadow's retention of Thompson when it received, in the mail, Shadow's supplemental expert witness list.

On August 13, Metro moved to disqualify the entire Latham & Watkins firm as counsel for Shadow on the basis that it had "wrongfully gained access to Metro's privileged and confidential communications, by means of improper contacts with Metro's consultants at Deloitte & Touche." Alternatively, Metro sought disqualification of Bottger "and all other Latham & Watkins attorneys" who had gained access to the privileged and confidential information. However, Metro did *not* seek disqualification of Deloitte &

Touche as Shadow's expert witness because, by that time, Deloitte & Touche had agreed to withdraw from the case.[3]

To support its motion, Metro offered declarations from Jorrie and Langs, two Andrews & Kurth attorneys. In pertinent part, Jorrie averred: "Between approximately July 15 and July 20, 1993, I had several conversations with Deloitte & Touche partners about using a member of that firm as an expert witness in this lawsuit. During these conversations, I explained to Ms. Dodds and other Deloitte & Touche representatives about our theories of the case, and how we anticipated the expert testimony would fit in both at trial itself and in helping with trial preparation. [¶] . . . In particular, on or about Monday, July 19, 1993, my associate Valerie Langs and I met for over an hour with Deloitte & Touche partners Julie Dodds, David Thompson, Cathy Watson, and Steven Wagner. Early in the meeting, *I told the Deloitte & Touche representatives that everything we would be discussing was confidential, and that they should not disclose the discussed matters to anybody.* Nobody in the room objected to my statement, and in fact *Ms. Dodds responded* in the presence of the other Deloitte & Touche representatives *that she fully agreed with me that everything we discussed would be confidential. During this meeting, Ms. Langs and I extensively discussed our litigation and trial strategies, our theories and legal analysis of this litigation, what assistance we desired from Deloitte & Touche to help us prepare for trial,* how we expected the expert testimony to fit in at trial, and what charts and graphs we wanted them to prepare. The Deloitte & Touche representatives fully participated in the discussion, and indeed offered several suggestions and comments on our strategy." (Italics added.)

Langs's declaration confirmed Jorrie's representations about the July 19 meeting.[4] Additionally, Langs averred: "On or about July 16, 1993, I had approximately two telephone conversations about this litigation with Deloitte & Touche partner Julie Dodds. During these conversations, I explained to Ms. Dodds the basic theories of our case, and especially about the damages issues to be presented at trial. Ms. Dodds in turn made several suggestions on how to deal with the damages issues at trial."

---

[3]The California Code of Regulations, which governs certified public accountants such as Thompson, provides, in part: "No information obtained by a licensee, in his or her professional capacity, concerning a client or a prospective client shall be disclosed by the licensee without the permission of the client or prospective client . . . ." (Cal. Code Regs., tit. 16, § 54.)

[4]In a supplemental declaration, Langs amplified those representations. She stated: "In particular, Ms. Jorrie and I explained Metro's potential damages theories and our legal analysis of those theories, and asked the Deloitte & Touche partners to comment specifically on the damages issues. The Deloitte & Touche representatives fully participated in the discussion, and indeed offered several suggestions and comments on our damages strategy."

Metro also offered a declaration from James Hicks, a member of Andrews & Kurth. He stated that after receiving Shadow's designation of Thompson as one of its expert witnesses, he spoke first with Dodds at Deloitte & Touche. He represented that "During our discussion, Ms. Dodds agreed that she and David Thompson had extensively discussed with us our theories of the case, the way the expert testimony would be used at trial, and the kinds of charts and graphs we wanted to use. Also, in response to my questions, she acknowledged that she had previously agreed that Deloitte & Touche's discussions with us were 'confidential,' and that she had never shown us or asked us to sign a form 'non-confidentiality' agreement which would have allowed Deloitte & Touche to be retained or consulted by Shadow. Toward the end of the conversation I asked Ms. Dodds if she would agree to withdraw David Thompson and Deloitte & Touche from this case, but she would not do so at that time."

Hicks further declared that he then spoke with Bottger at Latham & Watkins and told him that he "was concerned about Shadow's designation of experts. Mr. Bottger immediately responded, 'I guess you mean David Thompson.' I told him he was right, and that I was very disturbed about the whole matter because we had discussed the theories of our case with Mr. Thompson and the other Deloitte & Touche partners. Mr. Bottger responded that he 'had expected' we would be 'unhappy,' but that he intended to proceed with Mr. Thompson as his expert."

*Shadow's Opposition to the Disqualification Motion*

Shadow's opposition urged that the recusal motion was "baseless and frivolous." Consequently, it did *not* address the issue whether the entire Latham & Watkins firm should be recused or whether the disqualification should be limited to just those members of the firm who gained access to the information Metro characterized as confidential and privileged. In any event, to oppose the recusal motion, Shadow offered only the declaration of Bottger. In describing his meeting with Dodds, Bottger conceded that she had told him that Andrews & Kurth had interviewed Deloitte & Touche "to act as testifying experts" but had decided against retaining the firm. He alleged that "I never inquired of Ms. Dodds or anyone else at Deloitte & Touche about what they had been told by Metro regarding this case. No one from Deloitte & Touche ever told me anything regarding what was discussed during their interview with Metro."

In regard to his subsequent telephone conversation with Thompson, Bottger alleged "I talked briefly with Mr. Thompson regarding the case *and the manner in which I expect Metro will attempt to calculate its alleged damages.*

*I asked Mr. Thompson if he would be able to testify regarding the calculation and amount of damages claimed by Metro, and he said that he would be able to do so.* I then told Mr. Thompson that I would like to have him work on the case, and he indicated his agreement to do so. During my telephone conversation with Mr. Thompson, he mentioned that he recalled discussing this case with Metro's lawyers, but he never told me anything about what he was told about the case by Metro's lawyers, and I never asked him for such information." (Italics added.)

Although Bottger's declaration mentioned his conversation with Hicks, he did not deny Hicks's assertion that Bottger had expected that Metro would be "unhappy" with Shadow's retention of Thompson.

Markedly absent from Shadow's opposition papers were declarations from any Deloitte & Touche personnel or from Farrell, the other Latham & Watkins attorney present at the August 6 meeting. Thus, at this juncture, the Andrews & Kurth declarations about what had transpired at the July 19 meeting were uncontradicted.

*The Trial Court's Ruling on the Disqualification Motion*

Following a reported hearing at which the court expressed its concern that Metro had imparted confidential information to Deloitte & Touche who, in turn, had conveyed it to Latham & Watkins, the court granted the recusal motion.[5]

*Shadow's Motion for Reconsideration of the Recusal Order*

Within 10 days of the grant of the recusal motion, Shadow moved for reconsideration on the basis that the trial court's ruling had created "uncertainty . . . regarding the effect of pre-retention interviews with potential experts." For the first time, Shadow offered declarations from three of the four Deloitte & Touche personnel with whom Andrews & Kurth had met on July 19,[6] as well as Farrell, the other Latham & Watkins attorney who had spoken with Deloitte & Touche on August 6. The factual thrust of the motion for reconsideration was that Latham & Watkins "did not (nor could it) receive any confidential information from Deloitte & Touche . . . ."

[5]At one point the court stated: "When Latham and Watkins first found out that this—this firm had already spoken with the opposing party, that they had notice that they should really back out."

[6]A supplemental declaration from Dodds explained that because Bottger had stated that he was not interested in retaining Wagner as an expert, she had not put Wagner in touch with Bottger. She also claimed: "Mr. Wagner has not discussed this case with anyone at Latham & Watkins."

Thus, Latham & Watkins did *not* raise any claim that the recusal order was overbroad nor did it request the trial court to limit the disqualification order to particular attorneys in the firm.

The declarations contained the following allegations. Dodds described the July 19 meeting with Andrews & Kurth in the following way: "I understood that the attorneys from Andrews & Kurth were interviewing Mr. Thompson and Mr. Wagner as candidates to serve as testifying expert and that they did not intent [*sic*] to retain us as consultants only. [¶] . . . I further understood that, if either Mr. Thompson or Mr. Wagner were retained as an expert witness, our conversation with Andrews & Kurth was subject to discovery. [¶] . . . *I do not recall either of the attorneys from Andrews & Kurth stating that any of the information they were conveying during our conversation was confidential, nor do I recall learning any confidential information during the meeting.* At our meeting, the attorneys from Andrews & Kurth did not show any documents to us." (Italics added.)

Dodds asserted that in preparation for the August 6 meeting with Latham & Watkins, she had spoken with both Thompson and Wagner "to confirm that they did not believe that anything of a confidential nature had been divulged by the attorneys of Andrews & Kurth during our meeting on July 19, 1993 that would preclude us from assisting Latham & Watkins in this matter, assuming this was the same lawsuit. Mr. Thompson and Mr. Wagner agreed with me that they could not recall anything of a confidential nature having been discussed during our meeting with Andrews & Kurth."

As for the August 6 meeting with Bottger and Farrell from Latham & Watkins, Dodds asserted that she informed them of the July 19 meeting with Andrews & Kurth and that "none of the Deloitte & Touche professionals who attended the meeting could recall anything of a confidential nature having been discussed with the attorneys from Andrews & Kurth. [¶] . . . Mr. Bottger did not inquire about, and I did not disclose, any of the substance of the meeting that I had with the attorneys from Andrews & Kurth. Mr. Bottger specifically asked if we had been retained or had signed an engagement letter with Andrews & Kurth to which I responded that we had not and I further explained that we had not seen any documents related to the case including any pleadings. Mr. Bottger and I agreed that we could see no obstacle that would preclude Latham & Watkins from retaining Deloitte & Touche in this matter."

Watson's declaration stated that she agreed "entirely" with Dodds's recollection of the two meetings.

The declaration from Thompson, the Deloitte & Touche expert Shadow decided to retain, tracked that of Dodds, in that he too merely stated that he

did not "recall" that the Andrews & Kurth attorneys had stated the information they were conveying on July 19 was confidential and that he (Thompson) did not "recall" learning any confidential information at that meeting. As for his August 9 telephone conversation with Bottger, Thompson claimed: "Mr. Bottger did not inquire about, and I did not disclose, any of the substance of the meeting that I had previously had with the attorneys from Andrews & Kurth." Lastly, Thompson averred: "At the conclusion of our conversation, I indicated to Mr. Bottger that I felt qualified to serve as an expert witness on behalf of his client. However, I had yet to be provided with sufficient information such that I could form an opinion, or reach a conclusion, on any specific issues in this matter."

Farrell, the other attorney from Latham & Watkins who attended the August 6 meeting with Deloitte & Touche, offered a declaration representing that because he was not one of the attorneys working on the case, he did not participate in "any discussion regarding this matter" although he did remember that "either Ms. Dodds or Ms. Watson . . . indicated that she did not believe that Deloitte & Touche had received any confidential information from the opposing counsel."

Lastly, a supplemental declaration from Bottger amplified his 10- to 15-minute telephone conversation with Thompson. He recited: "My sole interest in interviewing Mr. Thompson was to determine whether he had sufficient knowledge of the broadcast industry to be able to analyze and respond to whatever damage theories Metro's expert might present in discovery and at the trial of this matter. I never asked Mr. Thompson about what he had learned from Andrews & Kurth . . . . I did not inquire about whatever Andrews & Kurth said to Mr. Thompson . . . . I have never been told by any person anything concerning the substance of any communication between Andrews & Kurth and Deloitte & Touche in connection with Andrews & Kurth's pre-retention meeting and telephone conversations with Deloitte & Touche."

*The Trial Court's Denial of Shadow's Motion for Reconsideration*

At the hearing on Shadow's motion for reconsideration, the court indicated that it would deny the motion on the basis that Shadow had failed to establish the predicate to such a motion—"new or different facts, circumstances, or law." (Code Civ. Proc., § 1008, subd. (a).) The court then stated

that had it granted the motion to reconsider, it would have reaffirmed its recusal order.[7]

This petition by Shadow followed. We issued an order to show cause to review this novel and important question of law.

## DISCUSSION

Evaluation of the trial court's order disqualifying Latham & Watkins from continuing to represent Shadow necessitates analysis of three distinct issues. (1) Did Metro, through its counsel Andrews & Kurth, communicate confidential information to Deloitte & Touche? (2) Did Deloitte & Touche share this confidential information with Latham & Watkins? (3) Is the disqualification of the entire Latham & Watkins firm warranted?

### Did Andrews & Kurth Give Confidential Information to Deloitte & Touche?

 Relying upon the law of the attorney-client privilege and the work-product doctrine, Shadow first urges that any information Andrews & Kurth may have given Deloitte & Touche was not confidential as a matter of law because Metro subsequently decided not to retain Deloitte & Touche as an expert witness. We disagree.

 Embraced within the ambit of the attorney-client privilege are, inter alia, statements from counsel to the expert which disclose confidential

---

[7]In the course of the hearing, the court stated: "This is a motion for reconsideration of the court's ruling wherein the law firm for Shadow Traffic was recused on the basis that they retained an expert who had previously been interviewed by Mr. Hicks' firm [Andrews & Kurth], and the court was persuaded and still is persuaded that only mischief can come of this because declarations of Mr. Hicks' associates indicate that they gave certain confidential information regarding damages and sought counsel and advice on which to plan the conduct of the case. And that same expert then was hired by the other side. [¶] And I have read all of the declarations as well as the moving papers. And I think what you are saying is that this accounting firm, which is composed of laymen, somehow has the mental discipline not to divulge that which was confidential, and that the attorneys have the presence of mind not to ask them any questions which would cause them to divulge any confidential information. . . . And I think the action of the firm in acting as the firm for the expert for the defense will be colored by what they know and what they know they got from counsel for plaintiff. . . . [¶] . . . I think what really hits me is that when defense counsel first contacted Deloitte and Touche they knew almost immediately that Deloitte and Touche had previously had discussions with the other side. And that should really have been a red flag. [¶] And in the interest of not letting something like this happen, which is—which you are probably going to seek a writ—it is time consuming, money consuming. A simple phone call to Mr. Hicks saying, 'We are interested in hiring the expert you talked to that you did not hire. Is there going to be any problem?'

"Mr. Rothenberg [counsel for Shadow]: The red flag did go up because Mr. Bottger asked Deloitte and Touche, and they said that there was nothing confidential that they learned.

"The Court: Well, that flies in the face of the declarations that I have that they were told that everything would be held in confidence."

information communicated by the client when disclosure is reasonably necessary to further the attorney's representation of the client's interest(s). (*National Steel Products Co.* v. *Superior Court* (1985) 164 Cal.App.3d 476, 482-484 [210 Cal.Rptr. 535].) However, the privilege is lost upon designation of the expert as a witness because the decision to use the expert as a witness manifests the client's consent to disclosure of the information. (*Id.* at pp. 484-485, relying upon *Sanders* v. *Superior Court* (1973) 34 Cal.App.3d 270 [109 Cal.Rptr. 770].)

■ As for the work-product doctrine, codified in Code of Civil Procedure section 2018, reports prepared by an expert as a consultant are protected until the expert is designated as a witness. (*Williamson* v. *Superior Court* (1978) 21 Cal.3d 829, 834-835 [148 Cal.Rptr. 39, 582 P.2d 126].) Then, the opponent may seek disclosure of the reports upon a showing of good cause, following the procedure set forth in *National Steel Products Co.* v. *Superior Court, supra,* 164 Cal.App.3d at pages 489-490. However, to the extent that said reports embrace counsel's impressions and conclusions, the work-product doctrine gives absolute protection to that information. (*Kizer* v. *Sulnick* (1988) 202 Cal.App.3d 431, 440 [248 Cal.Rptr. 712].)

■ Utilizing the above principles, Shadow makes the following points. Had Metro retained and designated Deloitte & Touche as its expert, the attorney-client privilege would have been lost so that the information would have been subject to disclosure. In the alternative, had Metro retained Deloitte & Touche as a consultant but then designated it as an expert witness, its report(s) would have been subject to disclosure upon a showing of good cause. Shadow therefore argues that because it would have had access to the information in those circumstances, it is unfair to deny it access because Metro pursued neither course of action. That is, Shadow maintains that the trial court's decision "has had the effect of turning th[ese] well-established rule[s] on [their] head by transforming Metro's communications with Deloitte & Touche into privileged communications at the moment Metro elected not to retain Deloitte & Touche." Citing several reported decisions from the federal trial bench, Shadow contends that communications with a prospective but nonretained expert are not privileged and that those communications cannot prevent the expert from subsequently being retained by any other party. However, closer scrutiny of these very decisions compels the contrary conclusion.

For instance, in *Paul* v. *Rawlings Sporting Goods Co.* (S.D.Ohio 1988) 123 F.R.D. 271, the plaintiff in a products liability action hired as an expert an individual whom the defendant had contacted about the possibility of serving as a defense expert and with whom the defense had discussed various

aspects of the case. The defense moved to bar the plaintiff from utilizing the expert's services. In ruling upon the motion, the trial court stated the question of disqualification should *not* turn exclusively on the determination of whether a contractual relationship ever existed between the expert and the defense. Instead, it concluded that ". . . the proper focus in such situations is to determine, first, whether the attorney or client acted reasonably in assuming that a confidential or fiduciary relationship of some sort existed and, if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate. Stating each proposition negatively, if any disclosures of privileged or confidential material were undertaken without a reasonable expectation that they would be so maintained (so that, in effect, any confidentiality or privilege relating to the matters communicated was waived), or if, despite the existence of a relationship conducive to such disclosures, no disclosures of any significance were made, it would seem inappropriate for the court to dictate to the expert or his new employer that his participation in the case be limited." (*Id.* at p. 278; see also *Great Lakes Dredge & Dock Co.* v. *Harnischfeger Corp.* (N.D.Ill. 1990) 734 F.Supp. 334, 336-338; *Nikkal Industries, Ltd.* v. *Salton, Inc.* (S.D.N.Y. 1989) 689 F.Supp. 187, 190; and *Mayer* v. *Dell* (D.D.C. 1991) 139 F.R.D. 1, 2.)[8]

We therefore conclude that communications made to a potential expert in a retention interview can be considered confidential and therefore subject to protection from subsequent disclosure even if the expert is not thereafter retained as long as there was a reasonable expectation of such confidentiality.[9]

Contrary to Shadow's argument, nothing in this division's opinion in *County of Los Angeles* v. *Superior Court* (1990) 222 Cal.App.3d 647 [271

---

[8]Shadow's misplaced reliance on these opinions stems from its focus on the fact that in each case the trial court, which wrote the opinion, resolved the factual issue of confidentiality against the party seeking to disqualify the expert. By so doing, Shadow ignores the real value of the opinions—the analytical framework in which the claim that confidential information had been conveyed to the expert should be evaluated. In this case, the trial court implicitly resolved the factual conflict in favor of the moving party (Metro). As we shall explain, insofar as that finding is concerned, our role, as an appellate court, is limited to determining if substantial evidence supports it.

[9]Shadow urges that this conclusion will "allow a party to deplete the pool of available experts simply by quickly interviewing all of the available experts, even though it had no intention of retaining all of them." This is a legitimate concern, but nothing in this record indicates that situation applies to this case. As the trial court noted when Shadow voiced this concern at the first hearing on the disqualification motion, there is no evidence that either Andrews & Kurth had interviewed Deloitte & Touche for the sole purpose of blocking Shadow's subsequent retention of the firm or that said interview precluded Shadow from being able to retain expert assistance. If such a case were to develop, we believe a trial court will be able to resolve such a claim. (See *Wang Laboratories, Inc.* v. *Toshiba Corp.* (E.D.Va. 1991) 762 F.Supp. 1246, 1248-1249 [suggests two-step inquiry trial court can make to

Cal.Rptr. 698] supports a contrary conclusion. In that case, we issued a writ directing the trial court to grant a defense motion to disqualify plaintiff's counsel based upon the following events. The action was a medical malpractice lawsuit. The defendant had designated Dr. Verity as an expert witness. The defense subsequently withdrew that designation but retained Dr. Verity as a consultant. Plaintiff's counsel then contacted Dr. Verity and told him that he was " 'now at liberty to be engaged' " by plaintiff. (*Id.* at p. 652.) The doctor expressed uncertainty about such action, and, according to plaintiff's counsel, was unaware that he had been withdrawn as a defense expert witness. However, after plaintiff's counsel reiterated that the doctor was now a free agent, Dr. Verity met with him and discussed the case, including a report he had previously prepared for the defense. Dr. Verity agreed to testify as an expert for the plaintiff. Following plaintiff's designation of Dr. Verity as an expert witness, defendant moved to disqualify plaintiff's counsel from further participation in the lawsuit because he had learned information protected by the work-product doctrine.

In analyzing this scenario, we noted: (1) counsel was aware Dr. Verity had been designated as a defense expert; (2) Dr. Verity had indicated to counsel he was not informed his designation was withdrawn; and (3) accordingly, plaintiff's counsel should have communicated first with defendant in order to clarify the situation. We stated: "To the detriment of [defendant] as well as his client, [plaintiff's counsel] erred when he pursued Dr. Verity and attempted to make him plaintiff's expert. . . . We hold that a party may, for tactical reasons, withdraw a previously designated expert witness, not yet deposed. If that expert continues his or her relationship with the party as a consultant, the opposing party is barred from communicating with the expert and from retaining him or her as the opposing party's expert. To conclude otherwise would produce two undesirable results: a designated expert subsequently withdrawn could 'sell' his or her opinions to the highest bidder and be free of concern about whether his or her previous consultation is protected by the work product privilege; and a party would never withdraw a previously designated expert for fear that the attorney's work product (i.e., the consultations with the withdrawn expert) would become available to the opposition. [¶] When an attorney violates this rule, he or she must be recused. Having become privy to an opposing attorney's work product, there is no way the offending attorney could separate that knowledge from his or her preparation of the case." (*County of Los Angeles* v. *Superior Court, supra,* 222 Cal.App.3d at pp. 657-658.)

Shadow urges *County* stands for the proposition that absent a retention of an expert as a consultant, opposing counsel is free to discuss with the expert

---

prevent attorneys "from engaging in the impermissible practice of retaining consultants merely to preclude opposing counsel from doing so"].)

the expert's earlier discussions with the adverse party. This argument ignores the key point made by the federal cases Shadow itself cited that even if the expert is not retained as a consultant, confidential information may very well have been conveyed. As we have already concluded, the dispositive question is whether there was a reasonable expectation that information would remain confidential; the existence of a formal relationship between the expert and counsel is just one factor to consider in making that determination.[10]

■ Given this conclusion, the next issue becomes whether or not Metro, through Andrews & Kurth, did, in fact, engage in a confidential communication with Deloitte & Touche. In this regard, the parties submitted conflicting declarations to the trial court.

Metro's declarations averred that counsel (Jorrie) had explicitly told Deloitte & Touche personnel that confidential information was being imparted to them and that said personnel acknowledged same. Metro's counsel (Jorrie and Langs) then extensively discussed Metro's litigation and trial strategies, including an explanation of Metro's potential damages theories; Deloitte & Touche personnel, including Thompson, fully participated in a discussion of these points, offering suggestions and comments on Metro's damages strategy.

Initially, Shadow offered only a declaration from Bottger. As Bottger had not been present at the July 19 meeting held by Andrews & Kurth and Deloitte & Touche, he had no personal knowledge of the subject matter of that discussion. Thus, his declaration sheds no light on the issue of whether Andrews & Kurth had disclosed confidential information to Deloitte & Touche.

In its motion for reconsideration, Shadow belatedly submitted very studied declarations in an effort to establish that there had been no disclosure of confidential information. The declarations merely recited that in regard to the July 19 meeting with Andrews & Kurth, Deloitte & Touche personnel

---

[10]Additionally, we note that Shadow ignores our admonition in *County of Los Angeles* v. *Superior Court, supra,* 222 Cal.App.3d 647, that at the outset, plaintiff's lawyer should have clarified the situation with defense counsel *before* pursuing the matter with Dr. Verity. The prophylactic effect of such a small step, regardless of whether or not the expert has been retained as a consultant, is manifest. If opposing counsel consents, no problem is created. Likewise, if the parties can agree on the acceptable parameters of a discussion with the expert, no problem is created. Additionally, we recognize that cooperation may not flow from one law firm to another. In that situation, the matter has been put to rest, and counsel, such as Latham & Watkins, could then either turn to other experts, such as the remaining five of the "Big-Six" accounting firms, or fashion an application to the trial court indicating its desire and the necessity for the services of the expert previously interviewed by its adversary.

did "not recall" being told the information was confidential and did "not recall" learning any confidential information. The difference between not recalling events which occurred a mere two months prior and denying these events is manifest; the failure to recollect is pregnant with the concession that the event in question may, in fact, have occurred but that the declarant has no immediate memory of it.

In any event, to the extent these declarations created a conflict in the evidence, the trial court resolved this conflict in favor of Metro. (See fn. 7, *ante.*) We will uphold that decision if there is substantial evidence in the record to support it. (*Klein* v. *Superior Court* (1988) 198 Cal.App.3d 894, 913 [244 Cal.Rptr. 226].)

While an execution by Andrews & Kurth and Deloitte & Touche of a formal confidentiality agreement prohibiting the disclosure of any information learned by the expert during the July 19 meeting would have been a better practice because the agreement would have eliminated many of the factual disputes in this case, the absence of such an agreement is not fatal.[11] The declarations of Jorrie and Langs represented that Jorrie affirmatively told the Deloitte & Touche personnel that the discussion was confidential and should not be disclosed to anyone and that the Deloitte & Touche personnel acknowledged that fact. Furthermore, both declarations also explained the subjects of the discussion as being the factual and legal theories

---

[11]In *Wang Laboratories, Inc.* v. *Toshiba Corp., supra,* 762 F.Supp. 1246, the court set forth the steps which could be taken when a lawyer retains an expert as a consultant. We believe its comments are also pertinent to a situation in which counsel meets with an expert to discuss retention. "First, a lawyer seeking to retain an expert and establish a confidential relationship should make this intention unmistakably clear and should confirm it in writing. It is helpful to include in the writing an explanation of the consultant's confidentiality obligation as well as a confirmation of the payment terms and conditions. Work-Product communications to the consultant should be prominently labeled as such. Just as lawyers must avoid ambiguity in the retention process, so too must consultants take care to avoid conduct that contributes to a lack of clarity about the relationship. If a consultant has doubts that she or he wants to be retained, those doubts should be unequivocally expressed. Such consultants should decline to accept any disclosures." (*Id.* at p. 1250.)

While Andrews & Kurth apparently did not ask Deloitte & Touche to sign a confidentiality agreement, the uncontradicted declaration of Hicks, a partner at Andrews & Kurth, had asserted that when he spoke with Dodds after receiving Shadow's designation of Thompson as one of its expert witnesses, Dodds stated that "she had never shown [Andrews & Kurth] or asked [Andrews & Kurth] to sign a form 'non-confidentiality' agreement which would have allowed Deloitte & Touche to be retained or consulted by Shadow." This reference to a "non-confidentiality" agreement strongly suggests that Deloitte & Touche recognized that the information they learned was confidential and absent such an agreement, they were precluded from speaking with Metro's adversary. This conclusion is certainly reasonable given that Deloitte & Touche is in the business of providing litigation support and financial consulting services to law firms. In fact, Deloitte & Touche reveals its sophistication in these matters by having form nonconfidentiality agreements, which, if executed, would have resolved this entire conflict.

about the case, matters traditionally considered confidential. Given all of these factors, we conclude that substantial evidence supports the trial court's implicit finding that Andrews & Kurth imparted confidential information to Deloitte & Touche even though Metro subsequently chose not to retain the firm as an expert witness.

*Did Deloitte & Touche Disclose the Confidential Information to Latham & Watkins?*

 The next issue is whether Deloitte & Touche disclosed to Latham & Watkins the confidential information conveyed by Andrews & Kurth. Analysis of this pivotal issue necessitates a review of the recent opinion rendered in *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572 [283 Cal.Rptr. 732]. There, a paralegal (Vogel) worked for three years in a law firm (Brobeck) that represented defendants in asbestos litigation, and he had access to privileged communications. After his discharge, he obtained a position in a law firm (Harrison) which represented plaintiffs in asbestos litigation. His work at Harrison involved asbestos cases. Before commencing work at Harrison, he obtained confidential attorney-client information from Brobeck files about cases in which Harrison was representing the adverse party. Brobeck never consented to Harrison's employment of Vogel. Brobeck successfully moved to recuse Harrison from the cases in which Vogel had accessed information. Harrison filed a writ petition to overturn the disqualification order.

The Court of Appeal sustained the trial court's decision. It held that when counsel hires a former employee of opposing counsel who possesses confidential information materially related to pending litigation, the hiring attorney should obtain informed written consent of the former employer to dispel any basis for a recusal motion. (232 Cal.App.3d at pp. 592-593.) This holding is analogous to our statements in *County* (*supra*, 222 Cal.App.3d 647) that plaintiff's counsel should have consulted with defendant before speaking with Dr. Verity and to the trial court's comments in this case (see fn. 7, *ante*), with which we agree, that Latham & Watkins should have first spoken with Andrews & Kurth after it learned that the firm had already met with Deloitte & Touche on behalf of Metro. The point is clear: a brief but professional exchange can expeditiously resolve the issue and avoid needless litigation.

Assuming that the hiring law firm has not acquired consent to hire opposing counsel's former employee, the Court of Appeal set forth the following analysis. "Absent written consent, the proper rule and its application for disqualification based on nonlawyer employee conflicts of interest should be as follows. The party seeking disqualification must show

that its present or past attorney's former employee possesses confidential attorney-client information materially related to the proceedings before the court. [Fn. omitted.] The party should not be required to disclose the actual information contended to be confidential. However, the court should be provided with the nature of the information and its material relationship to the proceeding. [Citation.] [¶] Once this showing has been made, a rebuttable presumption arises that the information has been used or disclosed in the current employment. The presumption is a rule by necessity because the party seeking disqualification will be at a loss to prove what is known by the adversary's attorneys and legal staff. [Citation.]" (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 596.)

 While the opinion is distinguishable to the extent it involved a paralegal who had worked for several years for the law firm whereas this case involves an independent contractor who met just once with the law firm, the thrust of the opinion is to implement the important public policy of protecting against the disclosure of confidential information and the potential exploitation of such information by an adversary. Thus, the difference in duration between the the paralegal's employment with the first law firm (several years) and Deloitte & Touche's contact with Andrews & Kurth (one meeting) is not significant because, as previously discussed, there is substantial evidence to support the trial court's finding that in that one meeting, Andrews & Kurth disclosed confidential information to Deloitte & Touche. We therefore conclude that its holding vis-à-vis the creation of a rebuttable presumption of disclosure is applicable to this proceeding.[12]

 As the purpose of this presumption is to implement the public policy of protecting confidential communications, the presumption is one affecting the burden of proof. (Evid. Code, § 605.) The effect of this type of presumption "is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (Evid. Code, § 606.) This means that because the trial court had first found the basic fact that gave rise to the presumption (Andrews & Kurth had given confidential information to Deloitte & Touche), it had to find the presumed fact (Deloitte & Touche had disclosed this confidential information to Latham & Watkins) unless it was persuaded by a preponderance of the evidence of the nonexistence of the presumed fact. (Appen. C to CALJIC (7th ed: 1986) pp. 336-337.)

With these principles in mind, we review the pertinent evidence. Bottger's first declaration, offered to oppose Metro's disqualification request, averred

---

[12]"The power of the higher courts to create presumptions is expressly recognized by Ev.C. 600 (assumption that 'the law requires to be made') read in connection with Ev.C. 160 ('law' includes 'decisional law')." (1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 220, p. 175.)

that he stated he never inquired about what Deloitte & Touche personnel had been told and that representatives from that firm never told him what had been discussed in the July 19 interview. However, his declaration confirmed that at least one topic from that meeting—Metro's damages theory—was one of the subjects of his subsequent telephone conversation with Thompson. After the trial court granted the disqualification request, Shadow tendered a declaration from Thompson that Bottger had not inquired about, and he (Thompson) had not disclosed, "any of the substance of the meeting" he had with Andrews & Kurth on July 19. A supplemental declaration from Bottger reiterated that he had not asked Thompson about his meeting with Andrews & Kurth and that no one had told him (Bottger) anything about the substance of the July 19 meeting between Andrews & Kurth and Deloitte & Touche.

To a large extent, these declarations miss the point. Deloitte & Touche was privy to confidential information about Metro's action against Shadow, including counsel's theories on damages. Damages was the very topic Bottger conceded he had discussed with Thompson. Even assuming that Bottger did not expressly ask Thompson about the contents of his discussion with Andrews & Kurth and that Thompson did not explicitly disclose the information to Bottger, Bottger could still obtain the benefit of the information because the data, consciously or unconsciously, could shape or affect the analysis and advice Thompson rendered to Shadow. Given that both Metro and Shadow consulted Thompson on the same issue—Metro's damages—it is highly unlikely that Thompson could conscientiously discharge his duty to Shadow as its retained expert and at the same time discharge his duty not to divulge confidential information received from Metro. (See *Peat, Marwick, Mitchell & Co.* v. *Superior Court* (1988) 200 Cal.App.3d 272, 289-290 [245 Cal.Rptr. 873], and cases cited therein.)

Furthermore, Thompson's declaration suggested a certain lack of candor on his part. On the one hand, he alleged he did not "recall learning any confidential information during the [July 19] meeting" with Andrews & Kurth but yet on the other hand he alleged he did remember that during his August 9 phone conversation with Bottger, he "did not disclose[] any of the substance of the meeting" conducted with Andrews & Kurth. The trier of fact could reasonably question the credibility of a declarant who does not remember the substance of the first conversation but who, with certitude, alleges he did not disclose any of that conversation in a later encounter.

There are circumstances in this case—notably the very short time that Deloitte & Touche was retained by Latham & Watkins and the brevity of the Thompson-Bottger telephone conversation—from which the trial court could

have concluded that the presumption that Deloitte & Touche had disclosed confidential information to Latham & Watkins was rebutted. But, as we have already discussed, there are other circumstances from which the trial court could reach a contrary conclusion. In this circumstance, appellate review of the trial court's decision is narrowly circumscribed. ■ When a judicially created presumption affecting the burden of proof is triggered, the question of whether the party who has the burden of establishing the nonexistence of the presumed fact has carried its burden of persuasion is an issue for the trier of fact to decide, not a reviewing court. (*Estate of Gelonese* (1974) 36 Cal.App.3d 854, 863 [111 Cal.Rptr. 833], and cases cited therein [judicially created presumption that will was executed as a result of undue influence if three elements are shown].) Thus, we may not reweigh the evidence or substitute our deductions for those of the trial court. (*Id.* at pp. 866-867; see also *McLellan* v. *McLellan* (1972) 23 Cal.App.3d 343, 357 [100 Cal.Rptr. 258].)

■ The record before us and our analysis of the declarations do not compel the conclusion that the trial judge exceeded the bounds of reason by implicitly concluding that Shadow had failed to carry its burden of persuading the court of the nonexistence of the presumed fact, to wit, that Deloitte & Touche had disclosed confidential information to Latham & Watkins. (See, e.g., *Hansford* v. *Lassar* (1975) 53 Cal.App.3d 364, 375 [125 Cal.Rptr. 804] [appellate court upheld trial court's determination that presumption had been rebutted even though contrary determination could have been reasonably inferred from the evidence], and *Baron* v. *Baron* (1970) 9 Cal.App.3d 933, 939 [88 Cal.Rptr. 404] [when the record contains contradictory evidence, an appellate court cannot reweigh the evidence in reviewing a trial court decision that a presumption has not been rebutted].) Thus, the presumption of disclosure remained unrebutted.[13]

*Should the Entire Latham & Watkins Firm Be Disqualified?*

■ The last issue is whether it was proper to disqualify the entire Latham and Watkins firm from continuing to represent Shadow in the underlying litigation.

"We realize the serious consequences of disqualifying attorneys and depriving clients of representation by their chosen counsel. However, we

---

[13]Another way to rebut the presumption that confidential information has been disclosed is to show that the newly hired person will have no connection with any litigation in which the confidential information could be used. That method is, of course, inapplicable to this case because Latham & Watkins hired Deloitte & Touche to work on the very same lawsuit it had discussed with Andrews & Kurth. Even though Deloitte & Touche has since withdrawn from the case, Thompson already discussed the matter with Latham & Watkins' partner, Bottger.

must balance the important right to counsel of one's choice against the competing fundamental interest in preserving [confidential information]. All attorneys share certain basic obligations of professional conduct, obligations that are essential to the integrity and function of our legal system. Attorneys must respect the confidentiality of attorney-client information and recognize that protecting confidentiality is an imperative to be obeyed in both form and substance." (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 602.) To discharge this obligation and at the same time properly represent its client Shadow, if Latham & Watkins wished to employ Deloitte & Touche, it should have contacted Andrews & Kurth upon learning of the latter's discussion(s) with Deloitte & Touche. Latham & Watkins failed to take that simple step. Had Andrews & Kurth objected to a retention by Latham & Watkins of Deloitte & Touche, Latham & Watkins, if it believed the objection unfounded, could have fashioned an application to the trial court indicating its desire and the necessity for the services of Deloitte & Touche. (See fns. 9 & 10, *ante,* and authority cited therein.) Instead, Latham & Watkins hired Deloitte & Touche and presumably gained the advantage of learning confidential information disclosed by its adversary. Given its implied findings on these points, the trial court did not abuse its discretion in prohibiting Latham & Watkins from further participating in the litigation.

Furthermore, given the manner in which Shadow has litigated the matter, we have no alternative other than to uphold the order disqualifying the entire firm. Neither in its initial opposition to the recusal motion, its subsequent motion for reconsideration, or its petition in this court, has Shadow ever suggested that the recusal order should be narrowed to disqualify only certain personnel at Latham & Watkins. At the hearing we conducted on our order to show cause, we invited counsel for Shadow (Bottger) to indicate if something less than disqualification of Latham & Watkins and all of its members would be an appropriate way to address this matter. We specifically referred him to *Mills Land & Water Co.* v. *Golden West Refining Co.* (1986) 186 Cal.App.3d 116, 133-136 [230 Cal.Rptr. 461], a case in which the appellate court found that disqualification of an entire firm was an abuse of discretion. Bottger responded that whether the issue was his personal disqualification or that of the entire firm, the trial court had abused its discretion in granting Metro's motion. Thus, Shadow has essentially taken the position that review of the disqualification order is an "all or nothing" proposition. We therefore have no choice but to give Shadow "nothing" on this issue.

## DISPOSITION

The order to show cause, having served its purpose, is discharged. The petition is denied.

Epstein, Acting P. J., and Hastings, J., concurred.

Petitioners' application for review by the Supreme Court was denied July 21, 1994. Baxter, J., did not participate therein.