Filed 3/19/13  P. v. International Chemical Systems CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> INTERNATIONAL CHEMICAL SYSTEMS, INC., <br><br> Defendant and Appellant. | D061075 <br><br><br> (Super. Ct. No. 37-2009-00103017-CU-TT-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed.

In this law enforcement action brought by the People of the State of California alleging violations of the Hazardous Waste Control Act, false advertising and unfair competition, the court denied defendant International Chemical Systems, Inc.'s (ICS's) motion to disqualify counsel for the People.  The basis for ICS's motion to disqualify was the People's retention of Sonja Beck as their expert on hazardous waste testing.  ICS alleged that it had worked closely with Beck and her company, MBC Applied

Environmental Sciences (MBC) for many years and that the testing work Beck performed was the "centerpiece" of ICS's defense in this action.

On appeal, ICS asserts the court erred in denying its motion to disqualify counsel because (1) ICS had a confidential relationship with MBC and Beck; (2) the information imparted by ICS to MBC involves a key issue in this case; (3) there was a rebuttable presumption that confidential information was transferred to Beck; (4) the People cannot rebut that presumption; (5) the actions of the People severely affect the proceedings before the trial court to the detriment of ICS; and (6) ICS's due process rights have been violated as a result of the court's decision. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Enforcement Action*

The People filed this civil law enforcement action against ICS based on its marketing and distribution of a hazardous waste cleaning product to businesses throughout the State of California. In this action, the People were (and are) represented by David J. Irey, a deputy district attorney for San Joaquin County. ICS claims its product, the FM-186 spill clean-up program (FM-186), renders spills of gasoline and diesel fuel nonflammable, nonhazardous and suitable for disposal into the trash. The People allege ICS's advertising claims are false, untrue, and misleading because use of FM-186 itself results in the unlawful disposal of hazardous waste, and further allege that ICS's advertising, sale, and use of the product constitutes an unlawful business practice.

2

B. *Motion To Disqualify*

1. Moving papers

ICS sought disqualification of counsel for the People and one of the People's designated experts, Beck, alleging ICS previously retained Beck's employer, MBC, as a consultant. ICS claimed that in this relationship, ICS's consultant Jim Figueira "may have disclosed a substantial (and indeed indeterminable) amount of ICS private and confidential information to MBC, its Vice President of Operations Michael J. Mancuso . . . , and its Group Scientist, BECK."

ICS asserted that it had a "long-standing relationship with MBC dating back to 1998." ICS further asserted that in 2002, in response to Deputy District Attorney Irey's investigation, its attorney, Joseph J. Armao, through ICS's outside technical consultant, Figueira, hired MBC to "conduct analyses of the potential aquatic toxicity of its various FM-186 spills cleanup materials." ICS also alleged that Beck participated in that testing. Based on the deposition testimony of Figueira, Irey was aware as early as June 6, 2011, that ICS's attorney, Armao, utilized the consultant services of MBC.

ICS also alleged that in other litigation between the People and ICS, ICS used MBC and Beck to test the toxicity of FM-186 waste.

Despite these facts, ICS points out that in June 2011 Irey served ICS with its expert witness designation, which included the designation of Beck of MBC on the topic of testing of FM-186 waste. In their second expert witness designation, the People again designated Beck of MBC as their expert witness.

3

ICS asserts that in July 2011, Irey provided ICS with aquatic toxicity tests performed by MBC as to FM-186, indicating some of the samples failed.

In his declaration, Figueira asserted that he, on behalf of ICS, was one of Beck's "key client contacts." He further alleged that he engaged in personal communications about test results, test standards and test findings with Beck. According to Figueira, ICS consulted with Beck from 1998 to 2010 regarding confidential "issues" that she has been designated to testify to on behalf of the People.

2. The People's opposition

In opposition to ICS's motion, the People pointed out that in August 2011, ICS's attorney, Alexander Giannetto, deposed Beck in an attempt to establish that some "confidential information" was provided by Beck to the People. However, Beck testified she was not aware of whether or not she possessed any confidential information about ICS and was not aware of having communicated any confidential information to Irey. The People also noted that despite ICS's claim that Figueira was one of Beck's "key client contacts," Beck stated in her deposition she did not recall ever meeting or speaking with Figueira. She testified that Beck and Irey did not discuss theories of the case, the evidence against ICS, or legal strategy. In his declaration, Irey also stated that he was unaware of having ever received any personal, confidential, or proprietary information related to ICS from Beck.

The People also note that during his deposition Figueira admitted that no attorney met with or accompanied him to any meeting with MBC. Figueira was also unable to recall what he may have shared with MBC or any of the other four primary laboratories

4

ICS used for research and development as well as analytical testing. Figueira could not provide any testimony substantiating his conversations or dealings with MBC. Moreover, the People pointed out that despite the claims by Figueira of a long-standing relationship which began in 1998, Figueira admitted he had no contact with Beck or MBC in 2004, 2005, 2006, 2007, 2008, 2009 and 2011. Figueira's sole 2010 contact with MBC was limited to submission of a single sample which was *subcontracted* to MBC and Beck through another laboratory, called Associated Laboratories.

The People also point out that Figueira entered into a confidentiality agreement with ICS. However, Figueira never sought or obtained a similar agreement with MBC or any other third party before purportedly disclosing the same alleged confidential information ICS now attempts to protect. Figueira did not seek written authorization from ICS to disclose "confidential" information to MBC. Figueira did not provide any detail as to what "confidential" information was shared with MBC.

In their declarations, MBC's president Shane Beck, vice-president Mancuso, and their counsel, William R. Mitchell, each denied receiving any of the alleged confidential information. Additionally, each deputy district attorney involved with this case provided declarations stating that they did not receive any confidential information concerning ICS from Beck or MBC.

C. *Court's Ruling*

On November 14, 2011, the court denied ICS's motion to disqualify counsel representing the People. In that ruling the court found that "some nuances of the situation created by the People in this case are closer to *Collins v. State of California*

5

[(2004) 121 Cal.App.4th 1112], and the 4th [District Court of Appeal's] decision in *Shandralina G. v. Homonchuck* [(2007) 147 Cal.App.4th 395 (*Shandralina G.*)], than to the situation in [*Shadow Traffic Network v. Superior Court* (1994) 24 Cal.App.4th 1067 (*Shadow Traffic*)]. The court therefore declines to disqualify counsel for the People. The court does, however, disqualify Sonja Beck and MBC from serving in any expert capacity in connection with this case . . . . The court further orders that Beck and MBC may not have any further contact with counsel for the People in connection with any matter relating to [this case], may not share their file materials with anyone, and may have no contact with any expert witness or consultant heretofore or hereafter retained by or designated by the People. Counsel for the People are forbidden from sharing any of Beck's or MBC's work product, or any of their own work product derivative of Beck's or MBC's, with any such expert or consultant. The court finds Beck's lack of recollection regarding her various engagements in this matter . . . to lack credibility, and finds that her continued involvement in this matter would be contrary to the truth-finding role of the courts. The court further finds that MBC's apparent lack of a conflict check system calls into question its and Beck's ability to serve as anything other than 'hired guns.' This is inconsistent with the integrity required of expert witnesses who testify before the court."

DISCUSSION

I

*APPLICABLE AUTHORITY*

The court's power to disqualify counsel derives from its inherent power to control the conduct of its ministerial officers. (Code Civ. Proc., § 128, subd. (a)(5); *Roush v.*

6

*Seagate Technology, LLC* (2007) 150 Cal.App.4th 210, 218 (*Roush*).) Disqualification motions implicate important interests of preservation of public trust in the administration of justice, a client's right to counsel of choice, the attorney's interest in representing a client, the financial burden of replacing a disqualified attorney, and any tactical abuse that may underlie the motion. (*Id.* at pp. 218-219.) Disqualification is a drastic action that should not be taken simply from hypersensitivity to ethical nuances or the appearance of impropriety. (*Id.* at p. 219.)

In disqualification cases, the party seeking disqualification bears the burden of establishing that the expert and/or attorney possesses confidential information materially related to the proceedings. (*Roush, supra,* 150 Cal.App.4th at p. 220.) Although the moving party is not required to disclose the actual information contended to be confidential, he or she must set forth the nature of the information and its relevance to the proceeding. (*Ibid.*) Once this showing is made, " ' "a rebuttable presumption arises that the information has been used or disclosed in the current employment." ' " (*Ibid.*)

The trial court's decision denying a motion for disqualification is reviewed for an abuse of discretion. (*Roush, supra,* 150 Cal.App.4th at p. 218.) However, " 'a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion.' " (*Ibid.*)

As required by the rule governing appellate review of orders based upon declarations and affidavits, we view the evidence most favorably to the order denying disqualification. (*Brunzell Construction Co., Inc. v. Smith* (1988) 200 Cal.App.3d 617, 620.) We also presume that the trial court found the facts that support the order to which

7

credibility relates.  (*Baugh v. Garl* (2006) 137 Cal.App.4th 737, 744.)  We do not redetermine the credibility of declarants:  "Credibility is an issue for the fact finder. . . . [W]e do not reweigh evidence or reassess the credibility of witnesses."  (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622.)

A.  *Analysis*

As we have noted, *ante*, disqualification of an expert and the law firm retaining the expert is warranted only when the moving party establishes that the expert and attorney actually possess confidential attorney-client information or work product related to the proceedings.  (*Western Digital Corp. v. Superior Court* (1998) 60 Cal.App.4th 1471, 1487.)  " 'The threat to confidentiality must be real, not hypothetical.' "  (*Ibid.*)

Here, to the extent the declarations were conflicting regarding communication of confidential information, the trial court exercised its discretion and resolved this factual issue in favor of the People, and we may not reweigh that determination on appeal. (*Shadow Traffic, supra,* 24 Cal.App.4th at p. 1083.)  MBC's vice-president, Michael Mancuso, declared that MBC was never retained or even requested to be an expert or consultant to Figueira or ICS.  Moreover, in his declaration, Figueira only states that he "may" have shared some unspecified confidential information, that he does not recall the nature of, or when it was disclosed.  Figueira never informed MBC that any information he shared was confidential, and did not seek a confidentiality agreement from MBC. Despite Figueira's claim of a long-standing relationship with MBC which began in 1998, Figueira admitted he had no contact with Beck or MBC in 2004, 2005, 2006, 2007, 2008, 2009 and 2011.  Figueira's sole 2010 contact with MBC was limited to submission of a

8

single sample which was *subcontracted* to MBC and Beck through another laboratory, called Associated Laboratories.

In her deposition, Beck testified that despite ICS's claim that Figueira was one of Beck's "key client contacts," she did not recall ever meeting or speaking with Figueira. Furthermore, she stated she was not aware of whether or not she possessed any confidential information about ICS and was not aware of having communicated any confidential information to Irey. She testified that Beck and Irey did not discuss theories of the case, the evidence against ICS, or legal strategy. In his declaration, Irey also stated that he was unaware of having ever received any personal, confidential, or proprietary information related to ICS from Beck. From all this evidence, the court could reasonably conclude that disqualification of counsel for the People was not necessary.

ICS relies upon the fact that in 2001 it retained its former counsel, Armao, to assist in its compliance with California state and local regulations and policies applicable to the sale and use of its FM-186 spill cleaning products. To support this argument, ICS submitted a 2002 letter from Armao to ICS's president, Ed Grubbs, which references a January 2002 "special test we conducted under the attorney-client and attorney work-product privileges" that was done by MBC. Attached to that letter is a cover page for the referenced test and a letter from Figueira to Armao with the invoice from MBC for the test.

However, that "special test" cannot be considered to be privileged. There is no evidence that Armao or any other attorney for ICS communicated directly with MBC. Furthermore, that letter states the test was done to "address some of [Irey's] concerns,"

9

indicating that it would be produced to him if necessary. ICS did in fact share the results of that test with Irey, thereby waiving any privilege ICS can claim applied. (*BP Alaska Exploration, Inc. v. Superior Court* (1988) 199 Cal.App.3d 1240, 1261.)

*Shadow Traffic, supra,* 24 Cal.App.4th 1067, upon which ICS relies heavily in its appellate briefs, does not assist them in this case. There, Metro Traffic Control, Inc. (Metro) sued the defendant Shadow Traffic. (*Id.* at p. 1071.) During the litigation Metro held a one-hour meeting with four members of an accounting firm to discuss having accountants from the firm testify as expert witnesses at trial. Aspects of Metro's action were discussed with the accountants during the meeting. (*Ibid.*) Metro ultimately decided not to retain the accounting firm. Several weeks later Shadow Traffic engaged one of the four accountants as a trial expert. (*Id.* at p. 1072.)

The trial court granted Metro's motion to disqualify Shadow Traffic's attorneys, and the Court of Appeal affirmed. The Court of Appeal concluded there was sufficient evidence for the trial court to find (a) the accountant retained by Shadow Traffic had obtained confidential information during his one-hour meeting with Metro; (b) this created a "rebuttable presumption" that the accountant's information about Metro had been disclosed to them; and (c) Shadow Traffic had not rebutted that presumption. (*Shadow Traffic, supra,* 24 Cal.App.4th at pp. 1085-1087.)

*Shadow Traffic, supra,* 24 Cal.App.4th 1067 is distinguishable because that case involved experts who obtained confidential information about pending litigation while working for or consulting with the attorneys representing one party to the lawsuit and who then went to work for or became consultants for the attorneys representing the

10

opposing party to the same lawsuit. Here, however, the evidence showed that neither MBC nor Beck ever met with, corresponded with, spoke with or were otherwise contacted by any attorney representing ICS. Figueira is not an attorney. There is no evidence of an attorney-client relationship between ICS and MBC. Further, there is no evidence Figueira communicated any attorney-client information to MBC or Beck.

Most important for this appeal, which involves an attempt to disqualify not only an expert, but also counsel for the People, there is no evidence confidential information was transmitted to the People's attorneys. Indeed, each of the deputy district attorneys involved in this case submitted declarations under penalty of perjury that they did not receive any privileged or confidential information from Beck or MBC, nor from any other deputy district attorney associated with this case. The burden of proof is on the moving party to show that any confidential information possessed by an expert witness was transmitted to opposing counsel. (*Shandralina G., supra,* 147 Cal.App.4th at pp. 411-412.) ICS has not submitted any evidence to show any confidential information was actually transmitted to counsel for the People.

It is of some concern that in her deposition Beck only testified that she was not "aware" of possessing any confidential information about ICS, instead of affirmatively denying that she possessed it. Testimony that one does not recall an event is not testimony that the event did not happen. "[T]he failure to recollect is pregnant with the concession that the event in question may, in fact, have occurred but the declarant has no immediate memory of it." (*Shadow Traffic, supra,* 24 Cal.App.4th at p. 1083.)

11

However, the court recognized that Beck's lack of memory concerning her work lacked credibility and on that basis barred her acting as an expert in the litigation. Nevertheless, the court, exercising its considerable discretion, found the weight of the evidence did not justify also disqualifying counsel for the People.

Moreover, contrary to ICS's contention, its due process right to a fair trial has not been violated. The court disqualified Beck from serving in any expert capacity in connection with this case and from communicating with the People concerning any of her work on this matter. Additionally, ICS did not designate Beck as an expert in this case. Beck was not asked to serve as a consultant to ICS, and she did not communicate with any attorney for ICS. Thus, ICS's right to a fair trial was adequately protected by the court's ruling.

In sum, we conclude that the trial court's decision was not erroneous because it is supported by sufficient evidence and is not unreasonable. (*Shadow Traffic, supra,* 24 Cal.App.4th at p. 1083; *Mills Land & Water Co. v. Golden West Refining Co.* (1986) 186 Cal.App.3d 116, 126 [denial of disqualification motion may be reversed only if trial court's decision is unreasonable].)

12

DISPOSITION

The order denying ICS's motion to disqualify counsel for the People is affirmed.

The People shall recover their costs on appeal.


NARES, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McDONALD, J.