[No. H030212. Sixth Dist. Apr. 25, 2007.]

PATRICIA ROUSH, Plaintiff and Appellant, v.
SEAGATE TECHNOLOGY, LLC, et al., Defendants and Respondents.

212

214

COUNSEL

Carcione, Cattermole, Dolinski, Okimoto, Stucky, Ukshini, Markowitz, Carcione, Aaron B. Markowitz and Joshua S. Markowitz for Plaintiff and Appellant.

Morrison & Foerster, Raymond L. Wheeler, David J. Murphy and Christine E. Lyon for Defendants and Respondents.

OPINION

**PREMO, J.**—Plaintiff Patricia Roush appeals from the trial court's order denying her motion to disqualify counsel for defendant Seagate Technology, LLC (Seagate). Roush claims that Seagate's attorneys obtained her confidential information when Kristopher Kilgore, the plaintiff in a separate case against Seagate, settled his suit and agreed to share what he knew about

Roush's case as part of his settlement agreement. According to Roush, she had shared confidential information with Kilgore at a time when the two were both clients of Roush's present counsel. We conclude that Roush did not meet her initial burden of proving that Kilgore possessed any information that Roush could claim was confidential. Accordingly, we shall affirm.

## I. Background

### A. Factual and Procedural Background

Roush sued her former employer, Seagate, and her former manager, defendant Kevin Scott, alleging sexual orientation discrimination and harassment. Roush claimed that, in March 2003, after suffering several slights from Scott and receiving what she perceived as a demotion, Roush approached Kilgore, her immediate supervisor, and asked him why Scott was treating her so harshly. Kilgore allegedly told her that Scott told him that Roush's problems were the result of her "lifestyle," which Roush understood to refer to her sexual orientation.

Kilgore had his own dispute with Seagate. Sometime around January 2003, Kilgore had spoken to his supervisor about alleged financial improprieties and concerns relating to Seagate's travel department. He reported these alleged improprieties to higher level management, which, he claimed, resulted in his being reprimanded and suspended for a day. Kilgore continued to report concerns to the Seagate legal department and to Seagate management. Among other things, he reported alleged irregularities in contracting and bookkeeping practices, breaches of confidentiality, and Scott's alleged sexual orientation harassment of Roush. All of this, he claimed, resulted in repeated acts of harassment and retaliation against him. He resigned from his employment in October 2003 and engaged the Markowitz Law Group, LLP (Markowitz), to represent him in connection with his claims against Seagate.

Meanwhile, Roush had been stung by Kilgore's report of Scott's "lifestyle" remark. She informally complained about it, then later made a more formal written complaint. Seagate investigated the allegation but could not corroborate it. Thereafter, Roush continued to receive criticism about her work. She resigned from Seagate on February 3, 2004. Kilgore introduced Roush to Markowitz and Roush engaged the firm to represent her in this action.

In or about August 2004, Kilgore had a falling out with Markowitz. Kilgore retained new counsel who filed his complaint against Seagate in federal court. In that lawsuit Kilgore alleged that Seagate had violated the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1514A) by retaliating against him for being a whistleblower, and that Seagate had constructively terminated him

in violation of public policy, due to his reports of alleged improprieties, his use of medical leave under the California Family Rights Act, and his report to the Seagate human resources department of Scott's alleged sexual orientation harassment of Roush.

Markowitz pursued this state court action on behalf of Roush.[1] After preliminary discovery was complete, defendants filed a summary judgment motion, setting the hearing for November 8, 2005. Roush obtained several continuances of the hearing on the ground that there was additional discovery she had not completed. In connection with her last motion for a continuance, filed January 13, 2006, Roush's counsel stated that he had recently learned through Kilgore's attorney that Kilgore had settled his suit against Seagate and, as a result, was "unable to talk" to Roush's counsel; he would have to be subpoenaed. On January 19, 2006, in response to one of Roush's discovery demands, Seagate produced a copy of its settlement agreement with Kilgore. Then in February, Seagate produced copies of two declarations it had obtained from Kilgore following execution of the settlement agreement. On March 10, 2006, Roush filed her motion to disqualify Seagate's counsel Morrison & Foerster, LLP (Morrison).

### B. *The Disqualification Motion*

Roush's motion was based upon a provision in the settlement agreement between Seagate and Kilgore by which Kilgore had promised to assist Seagate as follows: "Kilgore agrees to provide Seagate's Counsel with copies of all documents in his possession, custody, or control related to Ms. Roush's employment at Seagate or her claims against Seagate. Kilgore further agrees to provide all other information requested by Seagate's Counsel concerning Ms. Roush's employment at Seagate or her claims against Seagate. Kilgore further agrees to meet with Seagate's Counsel at reasonable times at their request to review such information or any other information related to Ms. Roush's civil action as they reasonably may request, and to respond to questions, with the first such meeting to occur on or by November 20, 2005. Kilgore agrees to notify Seagate promptly of any inquiries by Ms. Roush or her attorneys, and *to waive any attorney-client privilege he otherwise may be entitled to assert with respect to his own discussions and dealings with Ms. Roush's attorneys related to claims or allegations made in Ms. Roush's case.* Consistent with the foregoing, Kilgore agrees to inform Seagate's Counsel, upon request, of any documents he provided to Ms. Roush's attorneys related to claims or allegations made in Ms. Roush's case. Kilgore

---

[1] Sometime in the course of the proceedings below, Markowitz merged with another firm to become Carcione, Cattermole, Dolinski, Okimoto, Stucky, Ukshini, Markowitz and Carcione, LLP. Since the matter has been conducted primarily by Attorneys Aaron Markowitz and Joshua Markowitz, we shall continue to refer to Roush's counsel as "Markowitz."

agrees that, if he is subpoenaed as a witness in Roush's lawsuit, he will promptly notify Seagate of the subpoena or court order and meet with Seagate's designated attorneys prior to the deposition." (Italics added.)

The gist of Roush's disqualification motion was that Roush and Kilgore enjoyed a joint privilege that could not be waived absent consent from both of them and, that in extracting the quoted promise from Kilgore, Morrison improperly obtained Roush's confidential information. Roush's counsel submitted a declaration stating that he had previously represented both Kilgore and Roush. He characterized the representation as a "joint representation" and stated that he had informed both clients that "information could be shared without losing its privileged nature." He also stated that he had shared each client's confidential information separately with the other client and that he had one lunch meeting with both clients "where the entire time was spent discussing [Roush's] case."

Defendants opposed the motion, arguing that it was merely a tactical maneuver to gain further delay of the summary judgment proceedings and that, in any event, there was no basis for disqualification. Defendants argued that there was no showing that Roush and Kilgore were, indeed, joint clients or that they otherwise could have shared attorney-client information without waiving the privilege. Defendants also argued that they had no notice that Kilgore might have possessed protected information.

David J. Murphy was the Morrison partner responsible for the case. Murphy's declaration explained that Roush's discovery responses had made no reference to any "joint client" situation. To the contrary, during a discovery dispute in October 2005, Aaron Markowitz told Murphy that, as to any attorney-client privilege covering discussions between him and Kilgore, "[o]nly Mr. Kilgore can waive this privilege."

Murphy's declaration went on to state that as part of the agreement with Kilgore, he and other Morrison attorneys met with Kilgore in November and December 2005. During those meetings counsel asked Kilgore whether he had signed any written agreements with Markowitz and whether he and Roush had ever had any joint discussions with Markowitz. Kilgore's answer to both questions was that he had not.

Defendants included with their opposition the two declarations Seagate had obtained from Kilgore after the settlement agreement had been executed. In those declarations Kilgore describes his interactions with Roush while they were both employed at Seagate. He largely refuted some of the allegations Roush had made about her treatment at Seagate, although he confirmed that he had heard Scott make the "lifestyle" remark that he recounted to Roush in

March 2003. Murphy represented to the court at the hearing on Roush's disqualification motion that, aside from the information contained in Kilgore's two declarations, "[t]here was nothing else that we obtained from Mr. Kilgore nor that we focused on."

The trial court took the matter under submission and filed a written order the following day, stating simply that the motion is "denied." The trial court stayed proceedings pending this appeal.

## II. *Appealability and Standard of Review*

The broad issue before us is whether the trial court erred in denying Roush's motion to disqualify Morrison as defendants' counsel. An order denying a disqualification motion is appealable either as an order refusing to grant an injunction to restrain counsel from participating in the case (Code Civ. Proc., § 904.1, subd. (a)(6)) or as a final order on a collateral matter (*Meehan v. Hopps* (1955) 45 Cal.2d 213, 215–217 [288 P.2d 267]).

The trial court's decision denying a motion for disqualification is usually reviewed for abuse of discretion. (*Rosenfeld Construction Co. v. Superior Court* (1991) 235 Cal.App.3d 566, 572 [286 Cal.Rptr. 609].) "However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.] In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1144 [86 Cal.Rptr.2d 816, 980 P.2d 371] (*SpeeDee Oil*).)

In the present case, the pertinent facts are not disputed. Defendants do not dispute that Roush shared the information described in Markowitz's declaration and Roush does not dispute the facts set forth in Murphy's declaration. The dispute concerns only the legal effect of those facts. Accordingly, we treat the question as a matter of law subject to independent review. (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1144; *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

## III. *Legal Framework for Disqualification*

■ The trial court's power to disqualify counsel is derived from the court's inherent power "[t]o control in furtherance of justice, the conduct of its ministerial officers." (Code Civ. Proc., § 128, subd. (a)(5); see *Comden v. Superior Court* (1978) 20 Cal.3d 906, 916, fn. 4 [145 Cal.Rptr. 9, 576 P.2d 971].) Disqualification motions implicate several important interests, among

them are the clients' right to counsel of their choice, the attorney's interest in representing a client, the financial burden of replacing a disqualified attorney, and tactical abuse that may underlie the motion. (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 586 [283 Cal.Rptr. 732] (*Complex Asbestos Litigation*).) The "paramount" concern in determining whether counsel should be disqualified is "the preservation of public trust in the scrupulous administration of justice and the integrity of the bar." (*Ibid.*; see also *SpeeDee Oil, supra,* 20. Cal.4th at p. 1145.) It must be remembered, however, that disqualification is a drastic course of action that should not be taken simply out of hypersensitivity to ethical nuances or the appearance of impropriety. (*Hetos Investments, Ltd. v. Kurtin* (2003) 110 Cal.App.4th 36, 47–48 [1 Cal.Rptr.3d 472].)

The classic disqualification case involves the attorney switching sides, "so that an attorney who once represented 'A' now seeks to represent 'B' in a matter materially related to the original representation." (*Cooke v. Superior Court* (1978) 83 Cal.App.3d 582, 590 [147 Cal.Rptr. 915].) Disqualification in such a case is necessary to safeguard the attorney-client relationship. "A client should not fear that confidences conveyed to his attorney in one action will return to haunt him in a later one." (*Richardson v. Hamilton International Corporation* (3rd Cir. 1972) 469 F.2d 1382, 1384.)

In other cases, counsel may be disqualified where counsel has obtained the secrets of an adverse party in some other manner, such as where counsel's newly hired paralegal had access to the adversary's confidences while working for opposing counsel (*Complex Asbestos Litigation, supra,* 232 Cal.App.3d at pp. 598–599), or where counsel obtained confidential information from an expert with whom opposing counsel had consulted (*County of Los Angeles v. Superior Court* (1990) 222 Cal.App.3d 647, 658 [271 Cal.Rptr. 698]; *Shadow Traffic Network v. Superior Court* (1994) 24 Cal.App.4th 1067, 1084–1085 [29 Cal.Rptr.2d 693] (*Shadow Traffic*)). Disqualification is warranted in these cases, not because the attorney has a direct duty to protect the adverse party's confidences, but because the situation implicates the attorney's ethical duty to maintain the integrity of the judicial process. (*Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 592.)

It is also true, however, that mere exposure to the confidences of an adversary does not, standing alone, warrant disqualification. "Such a rule would nullify a party's right to representation by chosen counsel any time inadvertence or devious design put an adversary's confidences in an attorney's mailbox." (*Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 589.) Thus, where the attorney's client is the attorney's source of privileged information relating to the litigation, courts typically refuse to allow the disqualification, concluding that clients do not act inappropriately in providing information to their own attorney. "Since the purpose of confidentiality is

to promote full and open discussions between attorney and client [citation], it would be ironic to protect confidentiality by effectively barring from such discussions an adversary's confidences known to the client. A lay client should not be expected to make such distinctions in what can and cannot be told to the attorney at the risk of losing the attorney's services." (*Id.* at p. 590.) Further, in such situations, disqualification would do nothing to protect the attorney-client privilege because the client still has the information and may pass it on to new counsel, leaving the adversary in the same position. (*Neal v. Health Net, Inc.* (2002) 100 Cal.App.4th 831, 843–844 [123 Cal.Rptr.2d 202]; *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 298–299, 302–303 [106 Cal.Rptr.2d 906]; *Cooke v. Superior Court, supra*, 83 Cal.App.3d at p. 590.)

This case does not fit the pattern of any of the foregoing. This is not an attorney-conflict case since Morrison had no prior attorney-client relationship with Roush. And this is not a case where the alleged disclosure of confidential information was made by the attorney's own client. Kilgore was not a Seagate employee when he negotiated the settlement agreement and, therefore, his communications with Morrison were not attorney-client communications. (See *D. I. Chadbourne, Inc. v. Superior Court* (1964) 60 Cal.2d 723, 736–737 [36 Cal.Rptr. 468, 388 P.2d 700].)

This case is most similar to the expert witness and prior employee cases described in *Shadow Traffic* and *Complex Asbestos Litigation*. As Roush notes, the common thread running through those cases is that the attorney obtained confidential information from a source who could not ethically disclose the information without consent from the adversary.

█ In the expert witness cases, the party seeking disqualification has the burden to show that the expert possesses confidential information materially related to the proceedings before the court. The moving party's initial burden does not require the party to disclose the actual information contended to be confidential. " 'However, the court should be provided with the nature of the information and its material relationship to the proceeding.' " (*Shadow Traffic, supra*, 24 Cal.App.4th at p. 1085.) " 'Once this showing has been made, a rebuttable presumption arises that the information has been used or disclosed in the current employment.' " (*Ibid.*) The rule for disqualification in the case of former employees is the same. (*Complex Asbestos Litigation, supra*, 232 Cal.App.3d at p. 596.)

Adapting this rule to the present situation, we conclude that Roush had the initial burden to show that Kilgore possessed Roush's confidential information materially related to these proceedings. As we shall explain, it is not enough for Roush to show merely that she shared confidential information

with Kilgore. She would have to show that the confidential nature of the information survived the disclosure, i.e., that Roush did not waive her claim of confidentiality by sharing her information with a third party. Because we conclude that Roush did not carry her initial burden, we need not consider the second step in the analysis.

IV. *Discussion*

    A. *Evidence of Confidential Information Shared with Kilgore*

In support of her claim that she had shared confidential information with Kilgore, Roush produced the declaration of her attorney, Aaron Markowitz, who stated, in pertinent part:

"(3) I, along with my former firm, the Markowitz Law Group, LLP, simultaneously represented both Kristopher Kilgore and Patricia Roush with respect to their respective and interrelated claims against Seagate Technology.

"(4) During the course of this joint representation, myself, and members of my firm informed both Plaintiff and Mr. Kilgore that as joint-clients, information could be shared without losing its privileged nature.

"(5) During the course of this joint representation, myself and members of my firm did in fact share information obtained from each client, and discussed with each client potential strategies, potential evidence, and potential witnesses relevant to both client's cases.

"(6) On or about May 11, 2004, I had a lunch meeting with both Plaintiff and Mr. Kilgore where the entire time was spent discussing Plaintiff's case.

"(7) Mr. Kilgore subsequently dismissed the Markowitz Law Group, LLP, as his attorneys, but Plaintiff continued under our representation."

The declaration provides slim support for the claim that Roush shared her confidential information with Kilgore. Paragraph (6), which describes the joint lunch meeting, is insufficient on its face. Counsel states simply that the threesome "discussed" Roush's case. The contents of those discussions were not privileged merely because counsel was present. The group could well have been discussing matters of general knowledge that would not have been privileged. (See, e.g., *Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 309 [254 Cal.Rptr. 853] [holding that evidence of the discussion of " 'personalities involved in the litigation' " did not establish the sharing of protected information].) In paragraph (5), however, counsel admitted that he or other members of his firm discussed "potential strategies, potential evidence, and

potential witnesses relevant to both client's cases" with each of the two clients. This statement reflects the sharing of information that may be protected by either the attorney-client privilege or the attorney work product rule. But the statement, standing alone, does not meet Roush's initial burden. Roush must also show that the information remained confidential in spite of the disclosure to Kilgore.

## B. *Waiver*

■ In the attorney-client context, a confidential communication is "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted." (Evid. Code, § 952.)[2] Such confidential communications are privileged unless the client discloses a significant part of the communication or consents to its disclosure by someone else. (§ 912, subd. (a).)[3]

■ "Waiver of work product protection, though not expressly defined by statute, is generally found under the same set of circumstances as waiver of the attorney-client privilege—by failing to assert the protection, by tendering certain issues, and by conduct inconsistent with claiming the protection." (*McKesson HBOC, Inc. v. Superior Court* (2004) 115 Cal.App.4th 1229, 1239 [9 Cal.Rptr.3d 812].)

---

[2] Further statutory references are to the Evidence Code.

[3] Section 912 reads in pertinent part: "(a) Except as otherwise provided in this section, the right of any person to claim a privilege provided by Section 954 (lawyer-client privilege) . . . is waived with respect to a communication protected by the privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has the legal standing and opportunity to claim the privilege.

"(b) Where two or more persons are joint holders of a privilege provided by Section 954 (lawyer-client privilege), . . . a waiver of the right of a particular joint holder of the privilege to claim the privilege does not affect the right of another joint holder to claim the privilege. . . .

"(c) A disclosure that is itself privileged is not a waiver of any privilege.

"(d) A disclosure in confidence of a communication that is protected by a privilege provided by Section 954 (lawyer-client privilege), . . . when disclosure is reasonably necessary for the accomplishment of the purpose for which the lawyer . . . was consulted, is not a waiver of the privilege."

### C. *Nonwaiver*

#### 1. *Joint Clients*

■ There is no waiver in spite of communication to an additional person if that additional person is a joint client. The statutes do not directly define the phrase "joint client." It is indirectly defined in section 962, which describes an exception to the attorney-client privilege: "Where two or more clients have retained or consulted a lawyer upon a matter of common interest, none of them, nor the successor in interest of any of them, may claim a privilege under this article as to a communication made in the course of that relationship when such communication is offered in a civil proceeding between one of such clients (or his successor in interest) and another of such clients (or his successor in interest)."

■ Case law has established that joint clients are two or more persons who have retained one attorney on a matter of common interest to all of them, such as where the attorney represents both an insurer and its insureds. (*American Mut. Liab. Ins. Co. v. Superior Court* (1974) 38 Cal.App.3d 579, 592 [113 Cal.Rptr. 561].) "In such a situation, the attorney has two clients whose primary, overlapping and common interest is the speedy and successful resolution of the claim and litigation." (*Ibid.*) Each of the joint clients holds the privilege protecting their confidential communications with the attorney; one client may not waive the privilege without the consent of the other. (*Id.* at p. 591; *Armenta v. Superior Court* (2002) 101 Cal.App.4th 525, 533 [124 Cal.Rptr.2d 273]; see also § 912, subd. (b).)

#### 2. *The Common Interest Doctrine*

■ In the absence of a true joint client situation, litigants may nevertheless disclose confidential information without waiving the attorney-client privilege when the disclosure is to "those who are present to further the interest of the client in the consultation" or is "reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted." (§ 952; see § 912, subd. (d).) Indeed, it is these nonwaiver provisions that protect the information disclosed to expert consultants or counsel's employees. The nonwaiver concept has also been applied to protect the sharing of information among colitigants. In that situation the concept is referred to as the "common interest doctrine." (*OXY Resources California LLC v. Superior Court* (2004) 115 Cal.App.4th 874, 889 [9 Cal.Rptr.3d 621] (*OXY Resources*).)

There is little California case law discussing the common interest doctrine. Much of the case law is federal in origin. (*OXY Resources, supra,* 115

Cal.App.4th at p. 888.) Federal cases are not particularly helpful here since federal courts may rely upon common law principles but California courts must apply only those privileges created by statute. (*Ibid.*) There is no statute providing for a common interest *privilege* in California. (See *Raytheon Co. v. Superior Court* (1989) 208 Cal.App.3d 683, 689 [256 Cal.Rptr. 425].) To the extent there exists a common interest *doctrine* in this state, it is based generally upon waiver analysis or specifically upon interpretation of the provisions of sections 952 and 912, subdivision (d). (See *Raytheon. Co. v. Superior Court, supra*, 208 Cal.App.3d at pp. 688–689; *OXY Resources, supra*, 115 Cal.App.4th at p. 891.) Thus, parties may share privileged information when it furthers the attorney-client relationship. However, sharing destroys the privilege where the parties simply have "overlapping interests." (*McKesson HBOC, Inc. v. Superior Court, supra*, 115 Cal.App.4th at p. 1237.)

### 3. *Analysis*

Defendants argue that, even if Roush and Kilgore shared a joint privilege, the privilege is waived because Roush and Kilgore are now adverse to each other. Defendants maintain that one alternative theory Roush has advanced over the course of this case is that Kilgore may have concocted the tale about Scott's "lifestyle" remark. Defendants argue, therefore, that the interests of Roush and Kilgore have diverged sufficiently that any jointly held privilege has been extinguished.

It is true that under section 962, neither joint client may claim the privilege "in a civil proceeding" between themselves. But so far as we can tell from the record, there is no civil proceeding between Roush and Kilgore. Kilgore has merely chosen to settle his separate case and has agreed to cooperate with a defendant in this one. There is no California case, and little from other jurisdictions, that touches upon the question of whether a jointly held privilege or an information sharing agreement continues to apply in such circumstances. One federal case holds that the privilege of one joint client cannot be destroyed at the behest of the other where the two have merely developed ill-feelings or a divergence of interests. (*Matter of Grand Jury Subpoena, etc., Nov. 16, 1974* (S.D.N.Y. 1975) 406 F.Supp. 381, 394.)[4]

---

[4] The *Grand Jury* case, which involved a joint defense agreement, reasoned that, in contrast to the justification for applying the joint-client exception in litigation between the parties, there is no justification for it in a third party proceeding. "Indeed, to allow such disclosure would so further erode the privilege's protection as to reduce joint defense to an improbable alternative. How well could a joint defense proceed in the light of each co-defendant's knowledge that any one of the others might trade resultant disclosures to third parties as the price of his own exoneration or for the satisfaction of a personal animus? The attorney-client privilege, carved out to ensure free disclosure between client and counsel, should not thus be whittled away." (*Matter of Grand Jury Subpoena, etc., Nov. 16, 1974, supra*, 406 F.Supp. at p. 394.)

Although the problem begs for resolution, we need not resolve it here because it is clear to us that Roush and Kilgore were not joint clients of Markowitz and the evidence is insufficient to show that disclosure of Roush's protected information to Kilgore was necessary to her case.

Although Roush and Kilgore were *both* clients of Markowitz, they did not retain Markowitz to represent them in a single action. Counsel's conclusory description of the relationship as a "joint representation" is belied by the facts. Roush and Kilgore retained Markowitz at different times to represent them in distinctly different claims against Seagate. Each was a likely witness in the other's case. But even though Kilgore's claims included reference to Roush's claims, the matters for which they retained Markowitz were not matters of common interest, they were separate legal actions brought under separate theories of liability. One case did not hinge, even in part, on the success of the other. Roush offers no authority, nor have we found any, that supports her contention that two clients in such a situation would have a joint attorney-client privilege.

Most of Roush's argument really relates to whether the sharing of information with Kilgore was protected by the common interest doctrine. So far as we know, there is no talismanic method by which parties must prove that a common interest exists so as to eliminate the waiver otherwise created by a third party disclosure. Roush merely assumes that, given their overlapping interests, she and Kilgore could freely share their confidential information without affecting its privileged character. But that is not the law. Under sections 912, subdivision (d) and 952, Roush was bound to show, at minimum, that sharing her confidential information with Kilgore was reasonably necessary to advance her case. (*McKesson HBOC, Inc. v. Superior Court, supra*, 115 Cal.App.4th at p. 1237.) The necessity for disclosure to an expert consultant is usually self-evident. That is not so here. We cannot divine the necessity for sharing confidential attorney-client and attorney work product information with a percipient witness, which, as far as the evidence discloses, was Kilgore's only relationship to Roush's case. Roush made no effort to explain why disclosure to Kilgore was necessary. Accordingly, the evidence does not support a finding that the information shared with Kilgore retained its confidential character and, therefore, Roush failed to meet her initial burden of proof.

D. *Further Considerations*

In addition to Roush's failure to demonstrate that Kilgore possessed confidential information material to her case, she failed to demonstrate that

Morrison breached any ethical duty. The settlement agreement purports to do no more than to bind Kilgore to assist Seagate in defending against Roush's lawsuit and to waive *his* attorney-client privilege with respect to any communications he had with Markowitz about Roush's case. Roush does not allege that there was anything inherently improper in such a clause. Kilgore, as Roush's former supervisor at Seagate, would have personal knowledge about her case that Morrison was duty-bound to investigate. Further, Kilgore was perfectly free to waive his own attorney-client privilege. Even in the joint-client context, one client may have independent communications with the attorney that would be separately protected from disclosure to the other client. (*American Mut. Liab. Ins. Co. v. Superior Court, supra,* 38 Cal.App.3d at p. 592.)

Moreover, Morrison had no notice of circumstances that might have made it improper to seek information from Kilgore. The Morrison attorneys had asked Kilgore if he had any written agreements with Markowitz and if he and Roush had had any joint discussions with Markowitz. Kilgore responded negatively to both questions. Roush's discovery responses did not make reference to any joint-client situation. Markowitz had, at least once, disclaimed any special relationship that would prevent Morrison from seeking information directly from Kilgore. And Kilgore's declarations reflect nothing other than his personal knowledge of the case. Thus, at no point prior to Roush's filing of the disqualification motion did Morrison have any reason to believe that Roush could object to Kilgore's cooperation as outlined in the settlement agreement. Morrison's conduct did not transgress its duty to protect the integrity of attorney-client confidences.

## V. *Conclusion*

Although Roush demonstrated that she or Markowitz shared confidential information with Kilgore, she did not show that she and Kilgore were joint clients or that sharing information with him was reasonably necessary to her case. Roush, therefore, did not carry her burden to show that Kilgore possessed any of her confidential information. Further, the evidence did not support a finding that Morrison breached any rules of professional conduct or otherwise acted in an unethical manner by obtaining information from Kilgore. It follows that the trial court did not err in denying Roush's disqualification motion.

## VI. *Disposition*

The order of the trial court denying plaintiff's motion to disqualify the law firm of Morrison and Foerster and to strike the answer of defendants is affirmed.

Rushing, P. J., and Elia, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 25, 2007, S153187. Werdegar, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.