Filed 3/15/16  Nevarez v. Foster Farms CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOSE M. NEVAREZ,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>FOSTER FARMS, et al.,<br><br>    Defendants and Respondents. | F070316<br><br>(Super. Ct. No. 13CECG02624)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  Mark W. Snauffer, Judge.

Whelan Law Group, Walter W. Whelan, Brian D. Whelan and Lucas C. Whelan for Plaintiff and Appellant.

Seyfarth Shaw, James M. Harris, James D. McNairy; Wanger, Jones, Helsley and Oliver W. Wanger for Defendants and Respondents.

-ooOoo-

Jose Nevarez appeals from an order disqualifying his legal counsel, the Whelan Law Group (Whelan), from representing him in a wage and hour lawsuit which he filed against respondents, Foster Farms, LLC and Foster Poultry Farms, Inc. (collectively Foster Farms).  Foster Farms moved to disqualify Whelan after discovering that it was consulting with an attorney who had recently mediated an employment case between

Foster Farms and a different group of plaintiffs. The trial court found the mediator's conflicts of interest were imputed to Whelan, and concluded disqualification was mandatory because appellant's lawsuit was "substantially similar" to the prior action against Foster Farms in which the mediator had participated.

Appellant insists the mediator never acted on his behalf in a representative capacity. Therefore, he argues, the disqualification motion should have been denied absent proof the mediator actually provided Whelan with confidential information about Foster Farms. Appellant further contends that his lawsuit is not substantially similar to the previously mediated case. We conclude the trial court appropriately resolved the issue of vicarious disqualification within the framework of controlling case law. Finding no grounds for reversal, we affirm the challenged order.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 22, 2013, Whelan filed, on appellant's behalf, a putative class action complaint against Foster Farms alleging causes of action under the Labor Code and Business and Professions Code section 17200 et seq. for failure to pay wages, failure to provide an accurate accounting of earned wages, and unfair competition. Appellant is described in the complaint as a "ranch foreman" for Foster Farms, whose entities own and operate poultry farms throughout the state. The complaint further identifies appellant as the representative of a similarly situated class of current and former "ranch manager" employees who lived on Foster Farms' premises, were required to be "on-call" throughout five-day work periods, and allegedly did not receive compensation for on-call tasks performed outside of their normal work shifts (with a typical shift lasting at least 10 hours per day).

Within approximately one month of filing appellant's original complaint, Whelan, which is based in Fresno, placed a phone call to the law firm of Rudy, Exelrod, Zeiff & Lowe, LLP in San Francisco. The caller from Whelan apparently left a message for attorney Mark Rudy. Mr. Rudy referred the matter to his colleague, David Lowe (Lowe),

2.

informing Lowe that Whelan had called about "a technical issue related to class actions and wanted to bounce it off somebody." Mr. Rudy was too busy to return the call, and thus asked Lowe to handle Whelan's inquiry. Lowe called Whelan on September 26, 2013 to acknowledge receipt of the message and to advise that he was travelling, but would be available for a conversation the following Monday.

On September 30, 2013, Lowe had a telephone conference with one or more attorneys from Whelan about a legal issue concerning communications by defendant employers to putative class members prior to class certification. The conversation lasted for approximately 30-40 minutes. Whelan found the information provided by Lowe to be helpful, and inquired about retaining him as a consultant whom they would pay for "tactical advice in the case." Lowe was noncommittal to this idea, having never been hired in such a capacity, but said that if he were to bill for his time, he would charge an hourly rate of $675. Later that day, Lowe sent an email to Whelan containing attachments of briefs from cases he had worked on where disputes over allegedly improper communications with putative class members had been litigated, and also provided a citation to a case from the Central District of California that addressed the same issue.

Appellant's first amended complaint, which is the operative pleading, was filed on October 1, 2013. Six weeks later, Whelan exchanged a series emails with Lowe in regards to a disagreement it was having with defense counsel about the disclosure of contact information for putative class members. On November 14, 2013, Foster Farms sent a "meet and confer" email to Whelan which discussed the same issue Whelan had consulted with Lowe about the previous day. Later that evening, one of Whelan's lawyers accidentally included defense counsel on what was intended to be an internal

3.

email correspondence to another Whelan attorney. It can be inferred from the record that the message instructed one of the Whelan lawyers to contact Lowe for further advice.[1]

Upon receipt of Whelan's misdirected email, a defense attorney sent the following reply: "Gentlemen, [¶] I normally would not respond to this. But I am disturbed by the reference to [Lowe], who recently mediated a case for Foster Farms. I'd like to discuss this with you and until then, please refrain from discussing this case with him. This is not a good way to start the case…." Defense counsel was referring to *Alvarez v. Foster Poultry Farms, Inc., et al*, Merced County Superior Court Case Number CV001437 ("*Alvarez*"), which Lowe had mediated on or about July 9, 2013, approximately six weeks prior to the filing of appellant's lawsuit.[2] The *Alvarez* plaintiffs consisted of seven laborers and one "foreman/manager," each of whom had worked for Foster Farms. The lawsuit involved wage and hour claims under the Labor Code and included a cause of action for unfair competition under Business and Professions Code section 17200 et seq.

Whelan's email gaffe led to a months-long discovery dispute over Foster Farms' desire to learn the nature and extent of Whelan's dealings with Lowe. In resisting defendants' discovery efforts, Whelan invoked the attorney/client privilege and attorney work product doctrine, characterized Lowe as its "consultant," and relied upon case law recognizing the protected nature of attorney communications with a "consulting expert." The situation came to a head in April 2014 when Foster Farms moved to disqualify

---

[1] Appellant believes this document is protected by the attorney work product doctrine, which is presumably why it was not included in the record on appeal. In moving papers filed below, Foster Farms alleged that the email identified Lowe "as a resource whom the [Whelan attorney] should contact for purposes [of] obtaining information for use in prosecuting Plaintiff's claims against Defendants in this lawsuit." (Italics and other emphasis omitted.)

[2] By the time the case went to mediation, the Alvarez plaintiff was no longer a party to the action and the matter had come to be known as *Estrada, et al. v. Foster Poultry Farms, Inc. et al*. The parties on appeal continue to refer to the case as "*Alvarez*," as did the trial court below. We will do the same for the sake of consistency.

Whelan from the case. The motion was based in part on Foster Farms' assertion that during the course of the *Alvarez* mediation, it had revealed to Lowe "highly sensitive and confidential information" regarding "perceived potential vulnerabilities" in its employment policies and practices, as well its risk tolerances and overall litigation strategy.

On June 5, 2014, an evidentiary hearing was held in relation to the motion to disqualify Whelan. Lowe appeared in person and provided testimony consistent with the facts summarized above. He explained that he had been practicing in the field of employment law for at least 19 years and discussed his knowledge of class action procedure. In his experience, the employment law bar in California is collegial to such a degree that it is common for unacquainted practitioners to call one another and ask for guidance on various issues. As such, it did not strike him as odd that Whelan had essentially "cold called" him for advice.

Lowe estimated that he spent less than two hours conferring with Whelan during the relevant six-week period. At no time prior to the November 2013 email incident did Whelan make Lowe aware of the parties involved in appellant's case, nor did Lowe ask for that information. It did not occur to him to run a conflicts check.

On July 28, 2014, the trial court issued a written decision on the motion to disqualify Whelan. The ruling states, in pertinent part, that there is no evidence of "receipt by the Whelan Firm of any confidential information acquired by Lowe in his work as a mediator in the *Alvarez v. Foster Farms* case." Likewise, "[i]t does not appear that Lowe was ever formally retained as a co-counsel or expert consultant" in appellant's case. Nevertheless, the trial court found that Lowe had established an attorney/client relationship with appellant for purposes of a conflict of interest analysis. After considering the holdings in *Cho v. Superior Court* (1995) 39 Cal.App.4th 113 (*Cho*) and *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135 (*SpeeDee Oil*), the court was swayed by the fact that Lowe had furnished

5.

some degree of legal consultation, and that Whelan, "by its own contentions, believed it provided confidential and privileged information to Lowe about its case." Since Lowe owed fiduciary duties to Foster Farms by virtue of mediation confidentiality rules, and had provided consultation to an adverse party in a matter that was "substantially related" to the mediated case, Lowe's conflict of interest was imputed to Whelan and vicarious disqualification was deemed automatic. This timely appeal followed.

## DISCUSSION

**General Principles**

"A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with the judicial proceeding before it, in every matter pertaining thereto.' (Code Civ. Proc., § 128, subd. (a)(5) ….)" (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1145.) Attorney disqualification motions implicate two important but competing interests: a client's right to chosen counsel and the need to maintain ethical standards of professional responsibility. (*State Farm Mutual Automobile Ins. Co. v. Federal Ins. Co.* (1999) 72 Cal.App.4th 1422, 1428.) However, "[t]he 'paramount' concern in determining whether counsel should be disqualified is 'the preservation of public trust in the scrupulous administration of justice and the integrity of the bar.' " (*Roush v. Seagate Technology, LLC* (2007) 150 Cal.App.4th 210, 219 (*Roush*).)

**Standard of Review**

The California Supreme Court has outlined the standard of review as follows: "Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those

6.

findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law." (*SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1143-1144.)

The parties debate whether the deferential or de novo standard should be applied to the trial court's conclusions regarding (1) the relationship between Lowe and appellant, and (2) the similarities between appellant's lawsuit and the *Alvarez* matter. As we read the record, the trial court applied existing case law to an unusual, but essentially uncontroverted, set of facts. Our review is de novo insofar as we must determine whether the trial court's ruling was the product of a flawed legal analysis. (See *In re Charlisse C.* (2008) 45 Cal.4th 145, 159 (*Charlisse C.)* ["a disposition that rests on an error of law constitutes an abuse of discretion."]; *Castaneda v. Superior Court* (2015) 237 Cal.App.4th 1434, 1443 (*Castaneda*) [whether trial court applied correct legal standard to determine issue of vicarious disqualification presented a "pure question of law"].)

**Existence of a Qualifying Relationship**

"For purposes of a disqualification motion, '[s]tanding arises from a breach of the duty of confidentiality owed to the complaining party, regardless of whether a lawyer-client relationship existed.' [Citation.] Thus, some sort of confidential or fiduciary relationship must exist or have existed before a party may disqualify an attorney predicated on the actual or potential disclosure of confidential information." (*Great Lakes Construction, Inc. v. Burman* (2010) 186 Cal.App.4th 1347, 1356.) Such a relationship is generally presumed to exist between an attorney acting in the capacity of a neutral mediator and the parties to a mediation over which he or she presides. (See *Cho*, *supra*, 39 Cal.App.4th at p. 125; Evid. Code, § 1119, subd. (c) ["All communications, negotiations, or settlement discussions by and between participants in the course of a mediation or a mediation consultation shall remain confidential."].)

The trial court's ruling implies a finding that Foster Farms disclosed confidential information to Lowe during the *Alvarez* mediation. Without such a finding, the motion could not have been granted. Foster Farms supported its motion with a declaration from a company representative who attended the mediation, and she attested that Foster Farms disclosed material confidential information to Lowe during the course of the proceeding. The declaration provides substantial evidence of a confidential and/or fiduciary relationship between Foster Farms and Lowe.

The parties do not dispute that Lowe's receipt of confidential information in the *Alvarez* mediation would have precluded him from representing appellant in the current action against Foster Farms. The question is whether Lowe's conflict of interest should extend vicariously to Whelan. "Vicarious disqualification rules are a product of decisional law." (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 847.) Like the trial court below, we find that the opinions in *Cho*, *supra*, and *SpeeDee Oil*, *supra*, provide the most analogous precedent for this case.

In *Cho*, a superior court judge had presided over three settlement conferences in a particular lawsuit before retiring from the bench. Subsequent to the judge's retirement, the law firm of Graham & James substituted into the case as counsel for the defendant. Later, while the lawsuit was still pending, the retired judge entered into an "of counsel" relationship with Graham & James. The law firm implemented procedures to ensure that the retired judge was screened off from all work on the case. Nevertheless, the plaintiff moved to disqualify the entire firm from continuing to represent the defendant. (*Cho*, *supra*, 39 Cal.App.4th at pp. 116-117.) The trial court's denial of the motion to disqualify was reversed by the Second District Court of Appeal.

The appellate court in *Cho* relied on *Poly Software Intern., Inc. v. Su* (D.Utah 1995) 880 F.Supp. 1487 (*Poly Software*), wherein a plaintiff's attorney and his law firm were disqualified because the plaintiff's lawyer had acted as a mediator in a prior, "substantially factually related matter" in which parties to the current case had been

8.

involved.  (*Cho*, *supra*, 39 Cal.App.4th at pp. 122-125; *Poly Software*, *supra*, 880 F. Supp. at pp. 1488-1489, 1491-1493.)  Under *Poly Software*, "[w]here a mediator has received confidential information in the course of mediation, that mediator should not thereafter represent anyone in connection with the same or a substantially factually related matter unless all parties to the mediation proceeding consent after disclosure." (*Poly Software*, *supra*, 880 F. Supp. at p. 1494.)  This rule is intended to balance two policy considerations: "If parties to mediation know that their mediator could someday be an attorney on the opposing side in a substantially related matter, they will be discouraged from freely disclosing their position in the mediation, which may severely diminish the opportunity for settlement.  If, on the other hand, the disqualification net is thrown too wide, attorneys will be discouraged from becoming mediators.  The 'substantially factually related' standard … encourages parties to freely disclose their positions during mediation by assuring them that the specific information disclosed will not be used against them at a later time.  It also limits disqualification to subsequent situations where there is a substantial factual nexus with the previously mediated dispute."  (*Ibid*.)

The *Cho* opinion states, in pertinent part, "We agree with the analysis in *Poly Software* that disqualification of both the individual attorney and his or her firm is required where the attorney has been privy to confidences of a litigant while acting as a neutral mediator."  (*Cho*, *supra*, 39 Cal.App.4th at p. 125.)  After concluding the *Poly Software* rule for mediators should apply to judicial settlement officers, *Cho* went on to hold that the retired judge's conflict of interest was automatically imputed to the Graham & James law firm despite the firm's use of screening procedures.  The appellate court reasoned: "No amount of assurances or screening procedures, no 'cone of silence,' could ever convince the opposing party that the confidences would not be used to its disadvantage.  When a litigant has bared its soul in confidential settlement conferences with a judicial officer, that litigant could not help but be horrified to find that the judicial

officer has resigned to join the opposing law firm – which is now pressing or defending the lawsuit against that litigant. No one could have confidence in the integrity of a legal process in which this is permitted to occur without the parties' consent." (*Ibid.*, fn. omitted.)

In *SpeeDee Oil*, the California Supreme Court addressed the question of when a party's relationship with an attorney "has reached a point where the attorney can be subject to disqualification for a conflict of interest." (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1147.) The issue arose in the context of one law office unknowingly consulting with an attorney who was "of counsel" to a law firm that was representing an adverse party in the same case. Although the "of counsel" attorney was never formally retained as a consultant, preliminarily discussions about the possibility of such an arrangement were enough to create a fiduciary relationship for purposes of vicarious disqualification.

The affected litigants in *SpeeDee Oil* were intervening parties to an action brought by the Attorney General on behalf of the Department of Corporations against SpeeDee Oil Change Systems, Inc. The Mobil Oil Corporation (Mobil) was named as a defendant in a complaint filed by one of the intervening plaintiffs. The intervening plaintiff was represented by a sole practitioner who made a decision to associate the law firm of Shapiro, Rosenfeld & Close (Shapiro) as attorneys of record to help him prosecute his client's claims. Within days of the Shapiro firm's association as counsel for plaintiff, lawyers for defendant Mobil held a meeting with an attorney named Eliot Disner about the prospect of retaining him as a litigation consultant in the case. Disner happened to be "of counsel" to the Shapiro firm, but at the time of the meeting, none of the parties were aware of the conflict that had arisen by virtue of the newly formed relationship between plaintiff and Shapiro. Upon receipt of notice of Shapiro's association, Mobil told Disner that it would not be retaining his services, and then moved to disqualify Shapiro on grounds that Disner had a conflict of interest that was imputed to the entire law firm. (*SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1139-1142.)

10.

Mobil's attempt to disqualify Shapiro was unsuccessful in the trial court and on appeal to the Second District. However, the California Supreme Court ruled that vicarious disqualification of the Shapiro firm was mandatory and automatic because, "for purposes of a conflict of interest analysis," an attorney/client relationship had been formed between Mobil and Disner after Mobil's attorneys disclosed confidential information to Disner while exploring the possibility of hiring him as a consultant. (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1152.) This aspect of the high court's analysis is most relevant to the present claim that the trial court erred by finding a representative relationship existed between Lowe and appellant based on Lowe's communications with Whelan.

" ' "The fiduciary relationship existing between lawyer and client extends to preliminary consultations by a prospective client with a view to retention of the lawyer, although actual employment does not result." [Citation.] "When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie*." [Citation.] "The absence of an agreement with respect to the fee to be charged does not prevent the relationship from arising." ' " (*SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1147-1148.)

The *SpeeDee Oil* opinion instructs that the "primary concern" is not whether the lawyer is ultimately employed, but "whether and to what extent the attorney acquired confidential information." (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1148.) "That question is not necessarily answered by the amount of time involved. 'Even the briefest conversation between a lawyer and a client can result in the disclosure of confidences.' " (*Ibid.*) "Consequently, a formal retainer agreement is not required before attorneys acquire fiduciary obligations of loyalty and confidentiality, which begin when attorney-client discussions proceed beyond initial or peripheral contacts. *An attorney represents a client – for purposes of a conflict of interest analysis – when the attorney knowingly*

11.

*obtains material confidential information from the client and renders legal advice or services as a result.*" (*Ibid*., italics added.)

From an evidentiary standpoint, the email exchanges which took place on November 13, 2013 support the trial court's finding that Whelan, acting on behalf of appellant, provided confidential information to Lowe. The relevant portions of the parties' electronic back-and-forth discussion are as follows:

Whelan: The Defendant is refusing to produce the information about putative class members, but is requesting a BelAire West [*Belaire-West Landscape, Inc. v. Superior Court* (2007) 149 Cal.App.4th 554] notice process first before disclosing any putative class member information. Do you have any insight?

Lowe: Not unusual. There is some authority that an opt-out process is not necessary if you are requesting putative class member witness information, but most courts go along with the idea that it is appropriate to give the potential class members an opportunity to object to their addresses being released. You want to make sure that the notice is neutral, though. I actually haven't had to go that route in a while, and I don't think that I have a sample notice on our system.

Whelan: Should I fight that? They live on company premises and I can [G]oogle the addresses. I just want the phone numbers.

Lowe: I don't usually fight it and wouldn't under those circumstances.

The above conversation occurred six weeks after Whelan's initial 30-40 minute telephone conference with Lowe and went beyond an abstract discussion of legal principles. The first conference concluded with a proposal regarding the hiring of Lowe as a consultant, i.e., " 'with a view [towards] retention of the lawyer.' " (*SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1147-1148.) By Lowe's estimates, the parties spent an additional 1.3 to 1.5 hours communicating with each other in the weeks leading up to Whelan's fateful email transmission. In other words, the discussions moved "beyond initial or peripheral contacts." (*Id*. at p. 1148.) Whelan ultimately sought legal advice specific to appellant's lawsuit, and Lowe obliged the request. Moreover, as the trial court

12.

emphasized in its ruling, Whelan believed its communications with Lowe were privileged and confidential.

In the Reply Brief, appellant argues, "While it is true that [Whelan] asserted the work product privilege for its discussions with Lowe, the privilege was asserted to shield potentially revealing work product discussions about class action procedure and case law with Lowe [record citations], not about confidential factual information relating to this case." However, this district has interpreted *SpeeDee Oil* as establishing that an attorney's work product is properly treated as confidential information for purposes of a disqualification motion. (*Pound v. DeMera DeMera Cameron* (2005) 135 Cal.App.4th 70, 79.) Accordingly, we find no legal error in the trial court's conclusion that Lowe received confidential information from appellant through the actions of Whelan, and that the attorney/client relationship test was satisfied for purposes of a conflict of interest analysis.[3]

In summary, the rules governing attorney disqualification in traditional attorney/client relationships apply with equal force to situations where an attorney has formed a confidential relationship with a litigant while acting as a neutral mediator. The *Cho* opinion adopted the *Poly Software* analysis for mediators and applied it to a judicial

---

[3] The facts of this case are clearly distinguishable from the hypothetical scenarios described by appellant's counsel at oral argument involving casual conversations between lawyers over lunch, at events hosted by a local bar association, or in similar contexts and settings. It is difficult to imagine a trial judge construing such interactions as the formation of an attorney/client relationship unless, as here, there is a mutual understanding that one party is seeking to explore the option of having the other work on their client's case, be it in the form of a paid consultancy, as associated counsel, or under some other arrangement. Here, the subject communications went beyond this threshold, occurred on multiple occasions over a span of several weeks, and reached a point where there was a sharing of confidential information in the form of attorney work product. Our opinion should not be misinterpreted as discouraging the commonplace exchange of insights and ideas among members of the bar, e.g., a conversation between a less experienced attorney and a more seasoned practitioner wherein the latter provides general guidance on a legal issue with which the former is unfamiliar.

13.

settlement officer, whose conflict of interest was imputed to a law firm. Recently, in *Castaneda*, *supra*, the Second District ruled that the holdings in *Cho* apply not only to judicial settlement officers, but also to private attorneys who serve as settlement officers in judicially supervised settlement proceedings. (*Castaneda, supra,* 237 Cal.App.4th at pp. 1437-1438, 1445-1451.) It stands to reason that the same standard applies to attorneys who serve as neutral mediators in private mediation. As stated in *Castaneda*, "[a]n expectation of confidentiality can arise whenever a communication is made with promises that it will, in fact, be kept in confidence." (*Id.,* at p. 1451.) Such expectations arose between Foster Farms and Lowe in the *Alvarez* mediation, and the confidential relationship that was formed between them created a conflict of interest for Lowe in other substantially related matters such as the present lawsuit (see further discussion, *infra*).

An attorney-mediator's conflict of interest vis-à-vis a litigant with whom he or she has formed a confidential relationship through mediation can be vicariously imputed to other attorneys and law firms. For this to occur, the tainted attorney-mediator must have first established a representative relationship with an adverse party in the same matter in which the first confidential relationship arose, or in a matter that is substantially related to the previously mediated case. The test for determining the existence of such a relationship is the same as set forth in *SpeeDee Oil*. Imputation of the attorney-mediator's conflicts to another law firm necessarily requires some type of relationship between those parties, but we do not read *Cho* or *SpeeDee Oil* as requiring that the conflicted attorney be a member of, or "of counsel" to, the law firm being challenged in a disqualification motion. In *SpeeDee Oil*, vicarious disqualification was held to be permissible as between a law firm and an attorney who is "of counsel" to the firm because the essence of such a relationship " 'is the closeness of the "counsel" they share on client matters.' " (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1153, italics omitted.) The justification for allowing vicarious disqualification is arguably greater in situations where

14.

an outside attorney provides legal services to a law firm as a "consultant" or associated counsel on a matter in which he or she has a direct conflict of interest.

**Imputed Knowledge**

"Conflicts of interest commonly arise in one of two factual contexts: (1) in cases of successive representation, where an attorney seeks to represent a client with interests that are potentially adverse to a former client of the attorney; and (2) in cases of simultaneous representation, where an attorney seeks to represent in a single action multiple parties with potentially adverse interests." (*Charlisse C.*, *supra*, 45 Cal.4th at p. 159.) Where there is simultaneous representation, such as in the *Cho* and *SpeeDee Oil* cases, "a per se rule of disqualification applies." (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1147.) "With few exceptions, disqualification follows automatically, regardless of whether the simultaneous representations have anything in common or present any risk that confidences obtained in one matter would be used in the other." (*Ibid*.) When such cases involve an issue of vicarious disqualification, there is normally a conclusive presumption that the conflicted attorney has disclosed confidential information to the lawyers with whom he or she practices, and automatic disqualification extends to the attorney's law firm. (See *Id*. at pp. 1153, 1156; *Castaneda, supra,* 237 Cal.App.4th at p. 1443, 1452; *Kirk v. First American Title Ins. Co*. (2010) 183 Cal.App.4th 776, 814 (*Kirk*).)

When a conflict of interest arises from an attorney's successive representation of clients with potentially adverse interests, "the correct legal standard generally requires disqualification of the attorney if 'the [former] client demonstrate[s] a "substantial relationship" between the subjects of the antecedent and current representations.' [Citation.] Through the rule of 'vicarious disqualification,' we have generally extended this rule to require disqualification of a disqualified attorney's entire law firm. [Citation.] Thus, '[w]hen a conflict of interest requires an attorney's disqualification from a matter, the disqualification normally extends vicariously to the attorney's entire law firm.

[Citation.]' [Citation.] 'The rule of vicarious disqualification is based upon the doctrine of imputed knowledge,' which posits that the knowledge of one attorney in a law firm is the knowledge of all attorneys in the firm." (*Charlisse C., supra,* 45 Cal.4th at p. 161.)

Although Foster Farms was never Lowe's client, it did form an analogous confidential relationship with him in the *Alvarez* matter. The trial court therefore concluded that the substantial relationship test provided the most appropriate framework for determining the issue of vicarious disqualification. In doing so, the court conclusively presumed that Lowe's knowledge of confidential information which he acquired in the *Alvarez* mediation was imputed to Whelan. Appellant argues that rather than applying the substantial relationship test, the trial court should have based its ruling on his ability to show that Lowe never disclosed confidential information about Foster Farms to Whelan.

The substantial relationship test is derived from the duty of confidentiality owed by an attorney to his or her clients and ethical rules prohibiting the acceptance of employment in matters adversely affecting any of the clients' interests. (*Jessen v. Hartford Casualty Ins. Co.* (2003) 111 Cal.App.4th 698, 706, fn. 3 (*Jessen*); *T.C. Theatre Corp. v. Warner Bros. Pictures* (S.D.N.Y. 1953) 113 F. Supp. 265, 268.) Under the California Rules of Professional Conduct, an attorney "shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." (Rules Prof. Conduct, rule 3-310(E).) "For these reasons, an attorney will be disqualified from representing a client against a former client when there is a substantial relationship between the two representations." (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 587.) California's mediation confidentiality statutes impose similar duties of confidentiality, and exist to ensure that confidential information disclosed by parties during mediation " 'will not be used to their detriment through later court

proceedings and other adjudicatory processes.' " (*Cassel v. Superior Court* (2011) 51 Cal.4th 113, 123-124.)

The presumption of imputed knowledge is rebuttable in cases where a party seeks to disqualify an attorney based on the attorney's connection to a non-attorney expert or employee who possesses confidential information about the moving party. (*Kirk*, *supra*, 183 Cal.App.4th at pp. 805-806 and fn. 26; *Roush, supra,* 150 Cal.App.4th at p. 220.) Those types of cases do not involve the same policy concerns implicated by situations where a conflict of interest arises from the attorney's own duties of confidentiality. Adopting the same rebuttable presumption approach here, i.e., allowing the motion to hinge on proof of actual disclosure of confidential information, would create a more lenient disqualification standard for attorney-mediators than is used for other members of the bar.

Appellant purports to rely on *Kirk*, *supra*, in support of his argument that any presumption of imputed knowledge as between Lowe and Whelan was rebuttable. The *Kirk* opinion merely holds that in successive representation cases, the presumption of imputed knowledge to the challenged law firm "may be rebutted by evidence of effective ethical screening." (*Kirk*, *supra*, 183 Cal.App.4th at p. 814.) It is undisputed that neither Lowe nor Whelan made any attempt to implement screening procedures in this case. Had either of them done so, this matter would likely not be before us now. In circumstances such as these, where no attempt has been made to screen for ethical conflicts, the question of disqualification should be resolved by the substantial relationship test rather than through fact intensive mini-trials concerning the extent to which information acquired by the tainted lawyer during first representation may have been used and/or disclosed in the subsequent representation. (See *Jessen*, *supra*, 111 Cal.App.4th at p. 706; cf. *Farris v. Fireman's Fund Ins. Co.* (2004) 119 Cal.App.4th 671, 689, fn. 17 [vicarious disqualification required "absent some showing that an ethical shield has been created"]; *Klein v. Superior Court* (1988) 198 Cal.App.3d 894, 913-914 ["California law

17.

clearly prohibits continued representation in a situation … where a partner in a law firm has been disqualified from representation because of his prior receipt of confidential information, and where there has been no attempt to screen him from the litigation at hand."].)  Employing the substantial relationship test promotes judicial economy and furthers the overarching policy concern of preserving "public trust in the scrupulous administration of justice and the integrity of the bar." (*SpeeDee Oil*, *supra*, 20 Cal.4th at 1145.)  Any harshness in this approach is more than balanced out by the ease by which its consequences can be avoided.  As the trial court noted in its decision: "A simple conflicts check would have avoided the problem." (Quoting *id*. at p. 1157 (conc. opn. of Mosk, J.).)

**The Substantial Relationship Finding**

The substantial relationship test is normally applied to successive attorney/client relationships.  Our prior jurisprudence on this issue holds that if the attorney had a direct relationship with the former client, the test is whether "the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation[,] given its factual and legal issues[,] is also material to the evaluation, prosecution, settlement or accomplishment of the current representation …." (*Jessen*, *supra*, 111 Cal.App.4th at p. 713.)  Other courts have said the test "requires comparison not only of the legal issues involved in successive representations, but also of evidence bearing on the materiality of the information the attorney received during the earlier representation." (*Khani v. Ford Motor Co.* (2013) 215 Cal.App.4th 916, 921.)  In short, "a 'substantial relationship' exists whenever the 'subjects' of the prior and the current representations are linked in some rational manner." (*Jessen*, *supra*, 111 Cal.App.4th at p. 711, citing *Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283.)

For purposes of our analysis, the prior relationship between Lowe and Foster Farms was sufficiently direct and analogous to an attorney/client representation.

According to Lowe's testimony, his mediations typically involve a large amount of time spent in "private caucus" with each party, wherein topics such as the strengths and weaknesses of the claims at issue are evaluated and discussed. This is consistent with statements in the declaration of the Foster Farms representative who attended the *Alvarez* mediation, particularly her contention that she, Lowe, and Foster Farms' legal counsel had "candid discussions about the perceived strengths and weaknesses of [its] case tied directly to the facts at issue in the lawsuit, applicable legal standards, and how Foster Farms valued plaintiffs' claims."

The *Alvarez* plaintiffs notably included an individual who was allegedly employed by Foster Farms as "Foreman/Manager" in the Central Valley of California from April 2005 through February 2010. Appellant's operative complaint similarly alleges that he has worked for Foster Farms as a "Ranch Foreman" at a poultry ranch in Fresno County since 2001. Appellant challenges the trial court's finding that, like him, the foreman in *Alvarez* was required to live onsite, which is a central allegation in appellant's case. His arguments overlook Paragraph 37 of the First Amended Complaint in *Alvarez*, which alleges Foster Farms provided the foreman plaintiff with lodging, and that the plaintiff "was required to include his lodging in the calculation of his regular rate for purposes of his overtime premium." These allegations are pleaded in connection with the claim that Foster Farms "violated California law by failing to pay minimum wage and overtime compensation to Plaintiffs for work performed after 10 hours of work in one day or on the seventh day of the work week."

The pleadings in both the *Alvarez* matter and in appellant's lawsuit allege causes of action for failure to pay required wages and overtime compensation in violation of Labor Code section 1194, failure to comply with the record-keeping requirements of Labor Code section 226, and unfair competition in violation of Business and Professions Code section 17200, et seq. Having reviewed the same materials relied upon by the trial

court, we find no abuse of discretion or legal error in its conclusion that the evidence satisfied the substantial relationship test.

## **DISPOSITION**

The order of disqualification is affirmed.  Respondents are entitled to their costs on appeal.

_____

GOMES, J.

WE CONCUR:


_____

HILL, P.J.


_____

LEVY, J.